196 N.J. Super. 359 (1984)
482 A.2d 944
LAWRENCE J. BERMAN, M.D., AND SAMUEL A. CASSELL, M.D., PLAINTIFFS-RESPONDENTS,
v.
VALLEY HOSPITAL, AND BOARD OF TRUSTEES OF THE SOCIETY OF VALLEY HOSPITAL, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 1984.
Decided October 11, 1984.
*362 Edward A. Zunz, Jr. argued the cause for appellant (Riker, Danzig, Scherer & Hyland, attorneys; Glenn A. Clark, on the brief).
John F. Geaney, Jr. argued the cause for respondents (Cole, Geaney, Yamner & Byrne, attorneys; Peter R. Bray and Steven I. Adler, on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before the court on appeal from a judgment invalidating a resolution adopted by defendant Valley Hospital, a community hospital in Ridgewood, Bergen County. The consequence of the judgment was to compel the hospital to admit plaintiff physicians to its active medical staff.
This case is traceable to December 6, 1977 when plaintiff Lawrence J. Berman, M.D., a physician associated with the Paterson Clinic, wrote to the hospital and requested that he be appointed to its active medical staff. An appointee to the active staff has unlimited admission privileges in the hospital. On December 14, 1977, following a three-month freeze in admissions to the active staff adopted in October 1977, the trustees of the hospital, who are responsible for the policies governing its operation, adopted a resolution limiting future appointments to the active staff to physicians maintaining an office within the primary service area of the hospital. The resolution further provided that physicians who had been in private practice in Bergen, Passaic or Morris Counties in New Jersey or Rockland County in New York for more than two years immediately preceding the date of application were not eligible for appointment *363 unless the applicant's specialty was in a field of medicine for which the hospital had a previously determined need. The resolution did not affect admission to the courtesy medical staff whose members have limited privileges to practice in the hospital. On January 6, 1978 Berman's request for appointment was denied because he had been in private practice for more than two years within the excluded area.
In August 1980 Berman again applied for active staff admission. A few months later Samuel A. Cassell, M.D., another physician with the Paterson Clinic, requested that his courtesy staff privileges obtained in 1979 be changed to active staff membership. Like Berman he had been in private practice for more than two years within the excluded area. Inasmuch as both Berman and Cassell were ineligible under the December 14, 1977 resolution, their applications were denied but pursuant to the hospital's by-laws they administratively appealed the denials.
Their appeals were heard by an ad hoc committee of the medical staff. At the hearing plaintiffs' medical credentials and competence were conceded. Thus the issue before the committee was whether plaintiffs were qualified in a particular specialty for which there was a predetermined need. The hearing was not concerned with any question of the validity of the resolution as that matter was reserved. The ad hoc committee recommended that plaintiffs not be admitted to the active staff, a recommendation which, after administrative hospital appeals, was followed by the trustees who on January 27, 1982 denied plaintiffs' applications.
On March 18, 1982 plaintiffs brought this action in the Superior Court, Chancery Division, against the hospital and the trustees. Plaintiffs charged that defendants acted arbitrarily and capriciously in rejecting their applications, used improper eligibility requirements to exclude them, arbitrarily applied and enforced the eligibility requirements for admission to the active staff, wrongfully prevented legitimate competition from plaintiffs *364 and breached their fiduciary duty to the public. Plaintiffs further asserted defendants exercised unlawful monopolistic control over the hospital, attempted to monopolize trade and compete unfairly with plaintiffs and impaired and interfered with plaintiffs' ability to conduct their practices and pursue their livelihood. Relief was sought under the hospital's by-laws, statutory law, common law and public policy. Defendants filed an answer denying that plaintiffs were entitled to relief.
On October 29, 1982 the trial judge directed a bifurcation of the trial. The initial trial was to be concerned with the validity of the resolution of December 14, 1977 and the propriety of the denial of plaintiffs' applications. It was anticipated that the second trial would deal with the issues of unfair competition, monopoly, tortious interference with plaintiffs' rights and damages. Only the first trial has been held.
The record developed in this matter is extensive. Plaintiffs are licensed physicians in New Jersey practicing internal medicine. Berman has a subspecialty in nephrology and Cassell has a subspecialty in pulmonary medicine. Both are board certified in their specialties and neither's competency is questioned. They are associated with the Paterson Clinic with offices in Passaic and Bergen Counties. Doctors practicing at the hospital are organized into a medical staff which has adopted by-laws establishing categories of staff membership including active and courtesy members. Active members have offices and active practices in the hospital's primary service area and are allowed unlimited patient admissions. Courtesy members are limited to admitting four patients from the primary service area and providing consultation to ten patients per year.
The hospital's primary service area is 16 communities in northwest Bergen County and one in Passaic County. The hospital's goal is to provide a comprehensive range of preventative, curative and rehabilitative medical services. Although the hospital considers itself to be a community hospital, approximately one-third of its patients reside outside its primary service *365 area. However the requirement that its active staff members maintain an office in the primary service area assists the hospital in maintaining its community emphasis.
Historically use of the hospital's facilities has grown. By autumn 1977, its occupancy rates had reached or approached a level required by the State Health Care Administration Board as a prerequisite to the State issuing a certificate of need so that the hospital could add beds. In the medical/surgical, pediatrics and obstetrics-gynecology categories, its occupancy rates were respectively 89, 56 and 77% with an overall rate of 84%, figures based on licensed rather than available beds. The State requirements for issuance of a certificate of need in the three fields were 90, 75 and 75 occupancy percentages. Since there were fewer available than authorized beds its actual occupancy rates were higher than those shown. The 84% rate was at about the mean rate for other hospitals in Bergen and Passaic Counties. Between 1968 and 1976 admissions per doctor grew annually by an average of six admissions. Further the number of physicians on the active staff increased from 172 in 1968 to about 260 in 1977.
From 1974 through 1977 the increase in doctors on the active staff did not result in an increase in the percentage of occupancy, a stability attributable to an increase in the number of beds available. But by 1977 the hospital anticipated an intensification of occupancy levels because it feared it would be unable to add beds. Accordingly a limitation on the size of the active staff membership was indicated to maintain occupancy levels. The hospital's concern was well founded for on October 1, 1981 its application for acquisition of an ambulatory surgery facility was denied by the State Health Care Administration Board, the licensing board. The state board expressed concern about an adverse impact on inner-city hospitals in the area.
In the 12 to 15 months prior to adoption of the three-month freeze in October 1977, certain experienced doctors, including obstetricians from the staffs of other hospitals, applied for *366 privileges at the hospital. At the time of these applications the hospital had an OB/GYN rate of 74.8% compared to 73.6% and 60.9% respectively at Barnert and St. Joseph's, Paterson hospitals. Rumors of additional applications to the hospital from experienced doctors at other hospitals precipitated the October 1977 freeze. When the freeze was adopted the trustees authorized formation of a special committee to study the problem. The committee considered various proposals to keep the admissions to the hospital at a manageable level but found most of the proposals were unworkable. Ultimately the committee made a report recommending adoption of the two-year disqualification concept which the trustees implemented by the resolution of December 14, 1977.
Evidence at the trial demonstrated that overcrowding produces lower quality health care and higher health care costs. Indeed witnesses for both parties agreed that a hospital facing overcrowding should resolve the problem. There was a slight difference of opinion between plaintiffs' and defendants' experts as to whether the hospital faced overcrowding in 1977. The hospital's witnesses believed the situation by that year required immediate attention. An expert for plaintiffs suggested that it was in 1983 and for a "few years" preceding 1983, that the hospital was confronted with a situation requiring action to hold down occupancy rates. We do not consider this slight difference as significant.
Inasmuch as the hospital concluded that the occupancy problem in 1977 was partially attributable to experienced doctors with established practices transferring to it, the resolution of December 14, 1977 met the problem head-on and thus was considered desirable by defendants. The hospital perceived there were other advantages to the resolution. Its standards were clear and not open to subjective interpretation and were thus easily enforceable. Further the resolution left the door open for new doctors with lighter patient loads and new ideas. By minimizing hospital jumping of experienced physicians it would aid central urban hospitals. The resolution of December *367 14, 1977 is a unique approach to overcrowding which seems never to have been adopted elsewhere in the United States.
Plaintiffs presented evidence that the overcrowding could be dealt with in other ways. These include a lottery system on admission of physicians to the staff, a first-come, first-serve system for staff membership or a patient priority system based on the urgency of their medical needs.
At the conclusion of the trial the judge in a letter opinion of March 12, 1984 held the resolution was invalid both on its face and as applied. The judge found the resolution was designed to minimize overcrowding by limiting doctors on active staff because the number of doctors impacted on the number of patients. The hospital chose the two-year exclusionary method of limiting the new staff members because it believed that experienced inner-city doctors were moving to the hospital bringing large practices with them. The judge pointed out the freeze was imposed in response to rumors that members of the Paterson Clinic were considering seeking active medical staff membership at Valley. To justify the resolution the hospital used a "brain drain" theory that if a large number of doctors left the inner-city hospitals like Barnert their viability would be harmed. The judge found that the young doctor justification was a "ruse." He considered that the resolution was drafted for the benefit of doctors already on staff and was designed to minimize competition by keeping established doctors off the staff. He believed it would adversely impact on patients within the hospital's primary area if the patient's physician was not on the hospital's active staff. Pursuant to R. 4:42-2 the judge entered a final judgment on March 20, 1984 invalidating the resolution. Defendants have appealed from that judgment.
On this appeal defendants contend that plaintiffs failed to raise a challenge to the validity of the resolution of December 14, 1977 in the administrative proceedings and thus cannot question it now. They further maintain the trial court did not apply the proper standard of review in passing on the validity *368 of the resolution and that the resolution is valid. Plaintiffs assert they were not required to challenge the resolution at the administrative level, the trial court applied the proper standard of review, the resolution was adopted in bad faith in the interests of the members of the active staff and the trial judge's findings are supported by substantial, credible evidence and thus should not be disturbed.
We will not at this late date decide whether in the first instance the hospital should have passed upon the validity of the resolution in a contested proceeding. In Garrow v. Elizabeth General Hospital and Dispensary, 79 N.J. 549 (1979), the Supreme Court indicated that exhaustion of the internal hospital procedures is warranted when the dispute relates to the personal qualifications of an applicant to the medical staff. 79 N.J. at 560. But even if we assume that the exhaustion aspects of Garrow should apply in this case involving a hospital policy rather than a physician's qualifications, we are not barred from deciding this case on the merits. In Garrow the Supreme Court indicated that the exhaustion doctrine is not absolute. Exhaustion of administrative remedies is not required when only a question of law is involved, the administrative remedy would be futile, irreparable harm would result if exhaustion were required, agency jurisdiction is doubtful or the public interest calls for a prompt judicial decision. 79 N.J. at 561.
Here we are satisfied that the issues are primarily legal and the public interest calls for resolution of this seven year old controversy. The determination of this case may impact on other physicians. Eligibility for the hospital's active staff should be settled. Further we are aware of the reasons the hospital advances justifying the resolution and need no remand to obtain them. And in view of the trial court proceedings, the hospital is cognizant of plaintiffs' contentions as to the unreasonableness of the resolution yet it continues vigorously to defend it. Thus while we do not suggest that the hospital would not act in good faith on a remand to it (see Garrow, *369 supra, 79 N.J. 564 n. 3), we think a remand at this time would be futile. If plaintiffs have not by now been able to convince the hospital of the unreasonableness of the resolution we doubt that they will ever do so. No "salutary purpose" would be served by a remand to the hospital at this time and accordingly we reach the merits of the case. See Bd. of Education Bernards Tp. v. Bernards Tp. Ed. Assn, 79 N.J. 311, 317 (1979).
We do not directly review the validity of the resolution for the appeal to us is from the judgment entered by the trial judge. This distinction is significant for it must be considered to determine our standard of review. To the extent that a trial judge's decision is based on findings of fact our inquiry ordinarily is whether his findings are supported by adequate substantial and credible evidence. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974). Plaintiffs had a heavy burden in the trial court for the judge was obliged to uphold the resolution if the record contained sufficient reliable evidence, even though of a hearsay nature, to justify the adoption of the resolution. This is the test announced in Garrow, supra, 79 N.J. at 565. While it is true that Garrow involved the personal qualifications of a physician, we see no reason why at least equal deference to a hospital should not apply in a case dealing with its policies for in a policy case an excluded physician is not stigmatized by the result. Thus he has a lesser interest in judicial review than a physician challenged on a personal basis. We further note that Garrow modified Guerrero v. Burlington County Mem. Hosp., 70 N.J. 344, 356 (1976) which indicated the standard of review of a hospital decision is that customarily applied by courts in appeals from administrative agencies. Guerrero involved a dispute over hospital policy rather than the personal qualifications of a physician. Since the court in Garrow said it was modifying Guerrero, we conclude that modified standard would apply in a case involving exclusion of a physician on the basis of a hospital policy. If the Garrow standard was to apply only in cases involving the personal *370 qualifications of a physician, the court could have announced the standard there without disturbing Guerrero.
It is clear from the trial judge's opinion that the judge did not follow the proper standard of review as set forth in Garrow and thus we cannot determine the case merely by examining the record to see if there is evidence to support his findings. The judge outlined the evidence in support of and against the resolution and made his own determination that the resolution was unreasonable and invalid. He did not decide if there was sufficient reliable evidence to support the resolution.
In the light of the trial court's failure to follow the proper standard of review we could remand the matter with appropriate instructions for reconsideration. But for some of the same reasons we would not remand to the hospital we will not remand to the trial court. The time has come to resolve this matter. Further this case does not turn on assessment of the credibility of conflicting testimony. It turns on the existence of credible evidence in the record. We can ascertain from the record if there is such evidence to support the resolution. Precisely we must decide whether there is sufficient, reliable evidence, including hearsay evidence, showing that adoption of the resolution was a reasonable management decision governing staff privileges. Belmar v. Cipolla, 96 N.J. 199, 208 (1984). The resolution should be upheld if it reasonably relates to furthering the health care mission of the hospital and does not arbitrarily prevent qualified doctors from exercising staff privileges. Ibid.
The resolution easily passes this test. By 1977 the hospital was approaching a level of occupancy sufficient to add beds under State guidelines. Established doctors transferring patients had contributed to the crowding and additional transfers were expected. A collateral consequence of this trend was a drain on inner-city hospitals. The hospital considered alternative approaches to the problem and adopted the two-year disqualification approach. While some persons might prefer a *371 different method, the resolution of December 14, 1977 was reasonably designed to carry out a legitimate goal, the alleviation of an overcrowding problem. Further the evidence supports a conclusion that the resolution did not arbitrarily prevent otherwise qualified doctors from exercising staff privileges. The doctors ineligible for active staff appointments had voluntarily refrained for two years from joining the staff even though they practiced within an area in proximity to the hospital. Additionally they were established physicians and presumably would have larger practices than newer doctors. Thus the judgment of the trial court must be reversed.
As we have noted the trial court was concerned with the impact of the resolution on competition. We do not doubt that any restriction on membership, including those suggested in plaintiffs' evidence, may lessen competition. But the primary purpose of a hospital is to serve the public. Belmar v. Cipolla, supra, 96 N.J. at 208. Hospitals are not established to serve as arenas in which physicians compete for patients. If a resolution adopting a membership policy is otherwise valid, we see no reason to invalidate it simply because it lessens competition. If we did so, then membership on every staff would have to be unrestricted. Further we see no basis at all for the conclusion by the trial court that the young doctors provision is a "ruse." Rather it is a reasonable method of allowing new members to join the staff.
Our disposition does not end the litigation for there are other issues in the case. Obviously the parties have not and could not have briefed the impact of this decision on them. Further the record may not have been completely developed on those issues. In the circumstances we conclude that we cannot decide the remaining issues and thus this case must be remanded to the trial court for their disposition.
The judgment of March 20, 1984 is reversed. Insofar as the complaint relates to the validity of the resolution within the scope of the issues at the first trial, it is dismissed. The matter *372 is remanded to the Superior Court, Chancery Division, Bergen County, for further proceedings consistent with this opinion. We do not retain jurisdiction.