LAWRENCE J. BERMAN, M.D., AND SAMUEL A. CASSELL, M.D., PLAINTIFFS-APPELLANTS, v. VALLEY HOSPITAL AND BOARD OF TRUSTEES OF THE SOCIETY OF VALLEY HOSPI-TAL, DEFENDANTS-RESPONDENTS.

Argued September 10, 1985—Decided June 30, 1986.

*John F. Geaney, Jr.* argued the cause for appellants (*Cole, Geaney, Yamner & Byrne,* attorneys; *John F. Geaney* and *Peter R. Bray,* on the briefs).

*Edward A. Zunz, Jr.* argued the cause for respondents (*Riker, Danzig, Scherer & Hyland,* attorneys; *Glenn A. Clark,* on the briefs).

The opinion of the Court was delivered by

HANDLER, Justice.

This appeal raises an issue comparable to that considered in a companion case, *Desai v. St. Barnabas Medical Center,* 103 *N.J.* 79 (1986), also decided today. The defendant, Valley Hospital, located in Ridgewood, N.J., refused to admit plaintiffs-physicians to its regular medical staff pursuant to a policy denying medical staff privileges to doctors who practiced medicine in the hospital's service area for more than two years. The doctors commenced this action, contending that the hospital's

policy was arbitrary and unlawfully exclusionary and was in violation of anti-trust and tort laws.

The trial court bifurcated the issues and proceeded with the trial of the claims relating to the reasonableness and validity of the restrictive staff-admissions policy of the hospital. The court ruled that the hospital's restrictive admissions policy was invalid both on its face and as applied to plaintiffs in this case. The Appellate Division granted leave to appeal from this judgment and, on the basis that the trial court had used the wrong standard in reviewing the validity of the hospital's policy, unanimously reversed the judgment of the trial court. 196 *N.J.Super.* 359 (1984). The Appellate Division stayed enforcement of its judgment so that plaintiffs, to whom the hospital had granted provisional staff privileges, could continue to exercise those privileges at Valley Hospital pending proceedings in this Court. We granted plaintiff's petition for certification. 99 *N.J.* 229 (1985).[1]

## I.

The plaintiffs, Dr. Lawrence J. Berman and Dr. Samuel A. Cassell, are board-certified specialists in internal medicine. Dr. Berman's subspecialty is nephrology, Dr. Cassell's subspecialty is pulmonary medicine. These doctors are part of a group of seven internists with various subspecialties known as the Paterson Clinic, which maintains offices in Paterson and Ridgewood. Prior to their applications for full staff privileges both doctors had courtesy privileges at Valley Hospital, allowing them four hospital admissions and ten consultations per year for patients residing in Valley Hospital's primary service area.

The defendant Valley Hospital has 387 licensed beds of which 273 are medical/surgical. Its primary service area embraces

---

[1]Because the trial below involved only the validity of the hospital's staff admissions policy, unlike *Desai v. St. Barnabas,* this appeal does not involve any anti-trust or tort claims brought by plaintiffs.

sixteen municipalities in northwestern Bergen County. The hospital claimed that prior to 1977 it began to experience a problem of overcrowding and overutilization that was attributable to doctors from surrounding areas obtaining staff privileges at the hospital. It asserted that its medical/surgical bed occupancy rate in 1977 reached 89% and that the number of doctors on their medical staff had risen from 172 in 1968 to 260 in 1977.

In October 1977, administrators at Valley Hospital were informed that members of the Paterson Clinic were going to apply for full privileges at Valley Hospital. This information was communicated by administrators of nearby hospitals who were concerned about what they perceived as a pattern of flight from their "inner city" hospitals to Valley Hospital. Upon hearing these "rumors," the Executive Vice President and Director of the hospital called for an emergency meeting of the hospital's medical staff at 7:00 a.m. on October 14, 1977. The director and staff decided to recommend a three-month "freeze" or "moratorium" on applications for staff privileges at the hospital. Members of the executive committee of the hospital's board of trustees were polled by telephone that same day and the "freeze" was adopted. On October 26, 1977, the entire board of trustees ratified the decision of the executive committee.

A special committee, headed by William Saunders, a hospital trustee and lawyer, was appointed to study the bed occupancy problem and to replace the temporary "freeze" with a more permanent solution. On November 20, 1977, the committee reviewed four proposals for dealing with the bed occupancy problem. These were:

(1) admission to the Medical Staff or continued appointment to the Medical Staff would depend on having a fixed percentage of a physician's admissions from within the primary service area; (2) establishment of a table of organization under which the number of physicians needed in each of the departments and in each of the areas of specialty would be fixed and appointment would be available when vacancies occurred in the list; (3) admission to the Medical Staff would be limited to those physicians who have not been in private practice more than two years at Bergen, Passaic, Rockland or Sussex Counties with the

following exceptions: (a) exceptions would be made for those physicians having specialties for which there was limited demand; (b) the two-year requirement would not apply if the physician had not been in private practice (having an office open with regular hours) during the five years preceding his application; (c) a physician who had been a member of The Valley Hospital Medical Staff previously would be eligible for admissions; and (4) a preference in elective admissions would be given to residents of the primary service area.

The committee arrived at the tentative conclusion that both the third and fourth proposals should be adopted. However, after the medical advisers to the committee expressed the opinion that the fourth proposal could not be effectively administered, the committee recommended adoption of the third proposal alone, namely, that medical staff admissions be limited to doctors who had not been in private practice for more than two years in Bergen, Passaic, Rockland, or Sussex Counties, or met a predetermined need. Thereafter, on December 14, 1977, the hospital adopted this proposal by resolution.

Dr. Berman requested an application for full staff privileges on December 6, 1977. He was informed by letter dated December 14, 1977, that Valley Hospital was not releasing any applications until after the board of trustees acted on the proposals they were reviewing, and subsequently on January 6, 1978, that his application was denied pursuant to the December 14, 1977, resolution. When, on August 4, 1980, Dr. Berman again inquired about appointment to the active medical staff at Valley Hospital, he was told he was ineligible under the December 1977 resolution. Dr. Berman nevertheless filed an application for staff privileges on October 10, 1980, as did Dr. Cassell, who applied on March 20, 1981. Because the plaintiffs had been in private practice in the hospital service area for more than two years, their applications were denied under the December 1977 resolution. After hearings before the hospital's boards, both were also denied full staff privileges under the criterion relating to a predetermined need for their subspecialties.

Drs. Berman and Cassell contended that they were being professionally and economically injured by the restrictive staff admissions policy. Further, they claimed that the hospital's

policy benefits the doctors already on the staff and their patients, while violating the rights of the petitioners' patients who want to gain access to Valley Hospital. They also argued that the hospital took direct measures specifically and arbitrarily to exclude them personally from the hospital's active medical staff and thus the hospital's action is in effect invidiously discriminatory, unreasonably restrictive, and invalid.

Relying extensively on plaintiffs' expert, Dr. Lowell Bellin, the trial court suggested that alternative staff control or patient admission policies provided more evenhanded solutions to the overcrowding problem. The trial court also found that the "young doctor" theory advanced by the hospital—*i.e.*, that doctors with less than two years experience have fewer patients, are more "in touch" with modern techniques, and are traditionally disadvantaged by the seniority system—was a "ruse." Further, denying full privileges to Drs. Berman and Cassell, according to the trial court, was "onerous on the people in Valley Hospital's service area." The court concluded that the new policy was designed to benefit those doctors already on the regular staff of the hospital. It also determined that the hospital's restrictive staff-admissions policy "invidiously discriminates against age and experience, geographic location and those residences in the Northern New Jersey area." Accordingly, it ruled that the hospital's staff-admissions policy was invalid and unenforceable.

As noted, the Appellate Division reversed. It was of the opinion that the trial court applied the wrong standard of review by making its own determination of unreasonableness rather than deciding if sufficient reliable evidence supported the hospital's policy. 196 *N.J.Super.* at 370. From its review of the evidence, the Appellate Division found that the staff-admissions policy was reasonably designed to alleviate an overcrowding problem at Valley and did not arbitrarily discriminate against otherwise qualified doctors. *Ibid.*

## II.

The issue posed by this appeal is whether Valley Hospital's closed or restricted medical staff-admissions policy, particularly the criterion that serves to exclude the admission of doctors who have been in practice for more than two years in designated surrounding areas, can be sustained as a valid exercise of the hospital's discretionary health-care powers. In approaching this issue we accept as a basic premise that a hospital, in providing health-care services and facilities, is to be considered "a quasi-public entity to serve the public." *Doe v. Bridgeton Hosp. Ass'n, Inc.*, 71 *N.J.* 478, 486 (1976), *cert.* denied, 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.* 2d 1100 (1977). A hospital exercises its health-care powers "in trust," "for the benefit of the public," and "in aid of [its] service to the public." *Greisman v. Newcomb Hosp.*, 40 *N.J.* 389, 403–04 (1963); *see Falcone v. Middlesex County Medical Soc'y*, 34 *N.J.* 582 (1961). The fiduciary cast that is placed on the exercise of hospital health-care powers covers those relating to the selection of doctors as members of the hospital's permanent medical staff, *Greisman v. Newcomb Hosp., supra*, 40 *N.J.* at 402–03. This particular health-care function is especially impressed with a public interest because of the direct effect that physician staff-selection decisions have upon "the needs of the patients," *Belmar v. Cipolla*, 96 *N.J.* 199, 208 (1984). As we said in *Desai v. St. Barnabas Medical Center, supra*,

> while hospitals have broad discretionary powers in managing their affairs, including the selection of medical staff, their health-care powers are deeply impressed with a public interest and are fiduciary in nature.... Hospital powers that relate to the quality and extent of hospital health-care facilities and services must be exercised reasonably for the public good and must genuinely serve public-health objectives, which include the needs of patients, particularly the reasonable opportunity to select physicians and to have adequate access to hospital facilities. [103 *N.J.* at 90–91 (citations omitted).]

In determining the validity of a managerial decision made by a hospital, courts understand that the major concern is whether the public interest in health care is reasonably and rationally advanced by the hospital's decision. This judicial assessment as

to whether the hospital's health-care mission is genuinely met becomes particularly acute when the hospital determination has a discriminatory effect upon some individual doctor or a class of doctors. *Id.* at 95.

In this case, it is obvious that the hospital's restrictive staff-admissions policy discriminates against those doctors who have practiced in the hospital's service area for two years prior to applying for full staff privileges. The judicial analysis must therefore focus upon whether the restrictive hospital admissions policy with its discriminatory features genuinely serves a legitimate public-health objective.

Like the hospital action reviewed in *Desai,* Valley Hospital's medical staff-admissions policy can be fairly analogized to a governmental administrative agency's regulatory determination of a quasi-legislative character, purporting to formulate a policy or regulation of general and prospective applicability. This kind of administrative regulatory determination may be contrasted with one that is a so-called quasi-adjudicative decision, resolving an individual case based on individualized facts and considerations. However, at best the analogy between private hospitals and governmental agencies is loose; hospitals are not governmental instrumentalities. *See Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* at 92. We thus accord a hospital greater flexibility than would be available in reviewing the action of a governmental administrative agency executing delegated statutory authority. *Ibid.; see Garrow v. Elizabeth Gen. Hosp.,* 79 *N.J.* 549, 558 (1979) (in adjudicatory-type proceeding, hospital need not adhere to the evidentiary standards or procedural requirements applicable to administrative agencies). Moreover, in reviewing the validity of the kind of broad, quasi-legislative policy determination, such as presented in this case, the freedom of decisional action accorded a hospital is even greater and judicial review more tolerant. *See Desai v. St. Barnabas Medical Center, supra,* 103 *N.J.* 92, 93. Nevertheless, because its exercise implicates the public welfare, as

well as individual interests, this kind of managerial discretion is not unbounded. In reviewing its reasonableness, courts must consider the nature and adequacy of the information that has been advanced in its support. As we observed in *Desai v. St. Barnabas Medical Center, supra*:

> a hospital decision of this character will be viewed favorably if it is reached in the normal and regular course of conducting the affairs of the hospital, and is based on adequate information, regardless of form, origin, or authorship, that is generally considered reasonable and reliable by professional persons responsibly involved in the health-care field. [103 *N.J.* at 93.]

In this case we are satisfied that the hospital adopted its restrictive staff-admissions policy in the regular and normal course of conducting its affairs. It is true that the circumstances that triggered its actions were unusual. The hospital heard that members of the Paterson Clinic would seek admission to the regular medical staff at Valley Hospital and, in turn, make it their primary hospital. This information was given to them by the administrators of two hospitals used by the Paterson Clinic. As a result, Valley Hospital put a freeze on full staff admissions. However, this moratorium on staff admissions, while sudden, was followed by the creation of a committee to study and make recommendations as to a permanent staff-admissions policy that would ameliorate the overutilization of the hospital's facilities and services. The committee gathered and analyzed relevant statistical data, contacted other institutions using closed-staff facilities, and studiously considered each of the four proposals. Only after this deliberative process did the hospital, in December 1977, adopt its current staff-admissions policy. Thus, we conclude that while the hospital reacted quickly to a perceived emergency, its decisional actions were not taken precipitously or outside the normal course of hospital business.

That the hospital acted conscientiously and with due deliberativeness does not answer whether there was adequate information to support its actions. The issue is whether available information adequately demonstrates that a genuine health-

care objective is reasonably and rationally served by the restrictive staff-admissions policy adopted by the hospital.

The health-care objective to which the hospital's action is directed is the reduction and control of hospital overcrowding and excessive patient-bed occupancy. No one disputes that hospital overcrowding has deleterious effects on the quality of health care that can be provided by the hospital to the public. Although the fact of overcrowding and its severity was subject to dispute, the information upon which the hospital acted, as presented by way of evidence at the trial, was sufficient to establish both the reality and extent of hospital overcrowding. The hospital's occupancy rate was increasing in the 1970's and reached 89% in 1977. The record indicated the New Jersey Department of Health's belief that once bed occupancy exceeds the 85–90% level, there can be a substantive difference in the quality of care provided by a hospital. Plaintiffs' expert also agreed that "Valley Hospital was faced with a situation that did require some program with regard to dealing with possible overcrowding."

The hospital's decision to adopt a closed-staff solution to overutilization was supported in some measure by statistics showing a direct correlation between the numbers of doctors on staff and the rate of admissions of patients. Moreover, applying hindsight, there is little question that the restriction upon hospital staff admissions has worked in stabilizing bed-occupancy rates. Since the restrictive policy was adopted in 1977, bed-occupancy rates at Valley Hospital have remained at or below the 90% rate. Thirty otherwise eligible physicians have been barred by this policy. The trial court agreed that the December 1977 resolution implementing the restrictive policy had been successful in curbing admissions and bed occupancy rates, stating, "[w]e're not talking about whether this resolution works, it does work."

While the efficacy of a closed-staff policy in combating hospital overcrowding is supported by the record, it is contended by

plaintiffs that specific features of this policy are themselves unnecessary to achieve this purpose and, moreover, are not reasonably related to the accomplishment of any other genuine health-care objective. In particular the geographical limitations and the application of a staff-admissions ban to physicians with more than two years experience are challenged as being unsupported and unreasonable.

According to the hospital, these features of its restrictive staff-admissions policy directly address the major cause of its high bed-occupancy problem, namely, the wholesale transfer to the hospital of non-area patients by doctors with established practices. The hospital selected this proposal because

> it would encourage young doctors to open offices in the service area, would in its operation tend to give preference to residents within the primary service area, would prevent hospital jumping which brings patients to The Valley Hospital from outside the primary service area to the detriment of hospitals located outside the service area, would protect the high quality health care to which The Valley Hospital is dedicated and would not be unfair to physicians having offices in communities on the fringe of the service area.

Thus, the hospital targeted experienced doctors from outside its primary service area because they were bringing in patients from outside the primary service area at the potential expense of persons residing in proximity to the hospital. Further, according to the hospital, its policy advances the health-care objectives of other area hospitals, in particular, endangered inner-city hospitals, by preventing doctors from abandoning these hospitals through their admissions to Valley Hospital's medical staff and the transfer of their patients to Valley Hospital. Thus, although it considered four proposals that would serve to curb the admissions of patients, the hospital stressed that the particular policy adopted best served the people of the primary service area by foreclosing staff privileges to that class of physicians who might otherwise transfer substantial numbers of non-service area patients from nearby hospitals to Valley Hospital.

In support of this position, Michael Azzara, the President of the Valley Hospital presented charts illustrating the dramatic

increase in patient admissions resulting from the staff-admission of established doctors. Mr. Azzara also pointed specifically to the sudden transfer of three obstetrical practices to Valley Hospital from nearby Barnert Hospital and St. Joseph's Hospital that produced a "dramatic increase in [obstetrical department] utilization literally overnight." However, while the record reveals a justifiable concern over an influx of patients from Passaic County, from which 19% of Valley's patients came, little evidence or information supports the exclusion of doctors from Morris, Sussex, and Rockland Counties. Prior to the final adoption of the staff-admissions policy, a mere 1.0% of the hospital's patients resided in Morris County. Although the recent closing of All-Souls Hospital in Morristown fueled some legitimate concern about a rush of patients and doctors from that area, Mr. Azzara conceded that "in hindsight" Morris County doctors presented no problem. Further, the hospital offered no explanation for its inclusion of Sussex and Rockland County in the ban, which respectively provided the hospital with 0.5% and 0.2% of its patients.

It is also questionable whether, as the hospital contends, this policy helps preserve bed space for residents of its primary service area. The evidence revealed that three doctors from Passaic County admitted just prior to the adoption of the hospital's admissions policy admitted no more non-service area patients than did long-term staff doctors. Indeed, since implementation of the 1977 admissions policy, the percentage of non-service area admissions has actually increased.

Moreover, it has not been demonstrated that this limitation is itself essential to the effectiveness of a restrictive staff-admissions policy. Significantly, the hospital rejected the proposal that would give a "preference in elective admissions * * * to residents of the primary service area." The hospital conceded that it would have empty beds if admissions were limited to service area patients, while doctors' privileges remained completely open; it nevertheless rejected this proposal on the grounds of difficulty of administration. The record, however,

does not support this position. The chairman of the committee stated that he was "not convinced that ["administration"] is a problem which cannot be solved," and the committee itself recommended that in-depth study of such a proposal be undertaken. In addition, the fact that current courtesy staff privileges extend only to patients from the primary service area belies the hospital's conclusion that such a program is impossible to administer, as does the testimony of plaintiffs' expert that an admissions program based on urgency and residence is feasible. *Cf. Guerrero v. Burlington County Memorial Hosp.*, 70 *N.J.* 344, 366 (1976) (Pashman, J., dissenting) (finding no basis for hospital's rejection of a "gatekeeper" to screen admissions in order to ensure priority to urgent or emergent cases).

The staff-admissions policy's exclusion of doctors in practice more than two years also fails to advance reasonably its stated health-care objectives. The aim of the two-year restriction is to reduce overcrowding by excluding experienced doctors with established practices from the medical staff and, concomitantly, enhance patient care through the admission of recently educated doctors possessing knowledge of the latest techniques. While the trial court found that newly-licensed physicians generally do not serve as many patients as a doctor with more experience, the record does not support the hospital's direct surrogation of doctors with less than two years experience for other doctors with low patient loads and valuable educational knowledge and practical experience. In addition, no statistical or testimonial evidence supported Valley Hospital's claim that young doctors are more "in touch" with new ideas. Obviously, established and experienced doctors remain abreast of modern medicine. Moreover, even if recently-licensed doctors assumedly possess valuable or special knowledge consisting of current, state-of-the-art pedagogy, the record does not indicate that this aspect of medical education and training was a material factor in individual staff selections. Further, the record leaves us unenlightened as to whether medical needs and interests of

patients are better served by newly-educated but inexperienced doctors than by more experienced doctors who themselves may be well trained and abreast of the latest medical developments through continuing education.

The two-year practice limitation, on this record, appears too vague and attenuated in relation to its professed health-care objective involving high-quality medical education. While there may be some logical or facile appeal in this standard, it lacks any empirical or academic support. The two-year practice restriction is not the by-product of any extensive studies or background research. The particular program finds no support in experience, sound or controlled experimentation, reliable precedent, or even common-sense. Hospital representatives, who made a cross-country survey subsequent to the December 1977 resolution, were unable to find any other hospital in the country with the same or a similar restriction. Nor did the hospital produce any competent authority or expert who has recommended this solution to meet a hospital's capacity problem. The hospital's expert witness knew of no hospital that has imposed this kind of restriction on staff membership. On the other hand, plaintiffs' expert thought the two year exclusionary rule "bizarre," describing it as a "new gimmick" that punishes physicians for committing the "original sin" of practicing in the area for more than two years.

We conclude that the hospital has failed to marshall adequate information that demonstrates that its particular restrictive admissions policy is sufficiently related to a genuine and legitimate health-care objective. In its present formulation, the admissions policy ban against doctors from particular locations has not been justified and appears in most respects to be arbitrary. Further, the two-year practice limitation has not been shown on this record to be sufficiently related to its professed health-care objective of securing staff physicians who are both highly-educated and also have few patients.

These deficiencies are not unlike those found similarly wanting in the companion *Desai* case, wherein we concluded that the hospital's policy of admitting only those doctors joining the practices of doctors already on staff did not genuinely advance the professed objectives of providing better patient coverage while reducing occupancy. In the absence of persuasive information that the particular restrictions in this case are necessary to reduce hospital overcrowding and concomitantly serve to improve patient medical service, they cannot be said to advance reasonably and rationally legitimate health-care objectives. Shorn of such health-care benefits, there is nothing to mitigate the discriminatory and exclusionary impact of the hospital's staff-admission policy. It must therefore be regarded as arbitrary and unenforceable.

### III.

We observe that, based on this record, the invalid criteria appear to bear sole responsibility for the denial of admission of Drs. Berman and Cassell to the regular medical staff of Valley Hospital. The hospital therefore is directed to reconsider the applications of these doctors in light of this opinion. While in this case the hospital policy in its present form lacks adequate support, we acknowledge that a staff-admissions policy that focuses upon an applicant's years of licensure, length and type of experience, quality of medical education, and caliber of medical training, as well as the volume and residences of private patients, would be entitled to favorable judicial consideration. Absent the existence of a valid ground for denying the applications of Drs. Berman and Cassell, we expect that they will be granted full staff privileges.

Accordingly, the judgment below is reversed.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*For affirmance*—None.