SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Comprehensive Neurosurgical, P.C. v. The Valley Hospital (A-52-22) (087469)**

**Argued November 29, 2023 -- Decided April 16, 2024**

**FASCIALE, J., writing for a unanimous Court.**

The Court considers The Valley Hospital's challenge to a jury verdict in favor of a group of eleven neurosurgeons and their practice group, Comprehensive Neurosurgical, P.C. (collectively, plaintiffs). A jury awarded plaintiffs $24,300,000 in damages based on their claim that Valley did not deal with them fairly or act in good faith when it granted another group of neurosurgeons exclusive privileges in areas for which plaintiffs had held privileges.

Plaintiffs joined Valley's medical staff in 2003. Over the years, they expanded their group, and they helped grow Valley's neurosurgical programs and facilities as well. In addition to holding core hospital and admitting privileges, plaintiffs were given the right to "cover" the Emergency Room (ER) by treating "unassigned" ER patients who arrive to the ER on an emergency basis and are not any other neurosurgeon's established patient. Plaintiffs' practice at Valley primarily derived from treating those "unassigned" ER patients. Plaintiffs also received "specialized privileges" authorizing them to use the "Biplane" and "Gamma Knife" equipment they helped implement.

When a new hospital opened six miles from Valley in 2013, plaintiffs obtained privileges there as well. In 2015, Valley granted a different group of neurosurgeons exclusive rights to use the "Biplane" and "Gamma Knife" equipment and to treat "unassigned" ER patients, thereby revoking plaintiffs' privileges in those areas. Plaintiffs allege that grant of exclusive rights was not a valid administrative healthcare decision, but rather a form of retaliation for their perceived disloyalty in joining the new hospital. Valley alleges that the decision was valid in part because plaintiffs were diverting patients from Valley to the new hospital.

Plaintiffs filed a complaint against Valley. Following summary judgment motions, two claims reached the jury: (1) a breach of contract claim seeking money damages, in which plaintiffs alleged that Valley had breached its Medical Staff Bylaws (the Bylaws) by failing to provide plaintiffs with a hearing; and (2) plaintiffs' breach of the implied covenant of good faith and fair dealing claim, for

1

which they also sought money damages.  The trial court determined that plaintiffs' challenge to Valley's grant of exclusive privileges as an invalid administrative determination was "subsumed" within the implied covenant claim because the "same arguments" could be used for both.

At trial, plaintiffs presented emails from Valley's general counsel turned over by Valley during the discovery process.  Prior to discovery, the parties agreed that any inadvertent disclosures could be "clawed back," and Valley attempted to "claw back" the emails from counsel, asserting that they were protected by the attorney-client privilege.  Plaintiffs' counsel also stressed in summation that Valley had presented little evidence that plaintiffs had diverted patients from Valley to the new hospital.  Counsel made that argument despite knowing that materials plaintiffs had submitted in discovery showed sixty cases of patient transfers that were excluded from admission because Valley learned of them only after granting exclusive rights to the other neurosurgery group.  The jury ultimately found no cause of action on the breach of contract claim based on the lack of a hearing, but it awarded damages based on the breach of implied covenant claim.

Valley appealed, and the Appellate Division affirmed both the denial of summary judgment and the jury's verdict.  Valley petitioned for certification, arguing that summary judgment should have been granted in its favor because courts traditionally defer to hospitals' administrative healthcare policy decisions that "genuinely serve[] a legitimate public-health objective," Berman v. Valley Hospital, 103 N.J. 100, 107 (1986), "including the selection of [its] medical staff," Desai v. St. Barnabas Medical Center, 103 N.J. 79, 90 (1986).  Valley argues in the alternative that substantial cumulative errors tainting the jury verdict require a new trial.  According to Valley, the jury was improperly permitted -- through an unclear verdict sheet and instructions -- to find that Valley had breached an implied covenant of good faith and fair dealing.  Valley also contends that the jury verdict was tainted by the erroneous admission into evidence of privileged emails and by the misleading remarks plaintiffs' attorney made in summation.  The Court granted certification. 254 N.J. 210 (2023).

**HELD:**  Plaintiffs' good faith and fair dealing claim properly survived summary judgment, but the jury was not correctly charged or asked to rule on that claim.  The trial judge failed to instruct the jury that the only underlying contract to which the implied covenant could attach to had to be one beyond the rights afforded by the Bylaws.  Adding to the significant uncertainty created by the jury charge and verdict sheet are the improper admission into evidence of the privileged emails and the improper remarks by plaintiffs' attorney.  Those errors, cumulatively, had the capacity to lead the jury to reach a verdict it would not have otherwise reached and thus deprived Valley of a fair trial.

2

1.  A claim for breach of the covenant of good faith and fair dealing that is implied by law into every contract requires a plaintiff to demonstrate that the defendant's alleged misdeeds prevented the plaintiff from enjoying the full benefit of a particular bargain.  Although medical staff bylaws impose reciprocal legal obligations and rights between those who agreed to be bound, those obligations do not give rise to a traditional contract, to a claim for the traditional contract remedy of damages, or to a separate breach of the implied covenant claim.  Instead, when a hospital violates its medical staff bylaws, equitable relief may be available.  Thus, plaintiffs here would have been entitled to a hearing if Valley had violated the Bylaws by failing to provide one in the first place; the jury, however, expressly found that Valley did not violate the Bylaws.  The Bylaws cannot constitute the underlying contract for purposes of plaintiffs' separate breach of the implied covenant claim.  (pp. 28-34)

2.  Just as the Bylaws here offer no ground for a breach of an implied covenant of good faith and fair dealing claim, Valley's administrative healthcare decision to award exclusive privileges to a particular group cannot on its own give rise to a claim for breach of the implied covenant of good faith and fair dealing.  A hospital may not act in bad faith and simultaneously serve a "genuine" healthcare objective based on "reasonable and reliable" information.  See Desai, 103 N.J. at 91-93.  Physicians who are adversely affected by a hospital's administrative healthcare decision may challenge that decision by arguing that it was not made in accordance with the standard set forth in Desai.  Here, however, the trial judge concluded that plaintiffs' challenge to the Valley's grant of exclusive privileges was "subsumed" with their implied covenant claim.  As a result, the legal principles related to Valley's administrative decision became relevant only as to its defense to the implied covenant claim, and not as an asserted basis for money damages.  (pp. 34-38)

3.  The final basis advanced in the course of this litigation for finding that Valley was bound to act in good faith and deal fairly with plaintiffs is an alleged implied contract between the parties, one that goes "beyond the Bylaws."  Plaintiffs allege that, from Valley's initial offer to join and collaboratively build Valley's neuroscience department and from the parties' course of dealings since plaintiffs joined, it can be reasonably inferred that an implied contract existed between plaintiffs and Valley that would allegedly support their expectation to indefinitely maintain their privileges and rights absent a valid administrative healthcare decision providing otherwise.  In the event that plaintiffs could demonstrate that all the fundamental elements of contract formation had been established, their theory of an agreement beyond the rights afforded by the Bylaws would be contractual in nature.  Among the three possible sources to support plaintiffs' claim here -- the Bylaws, Valley's administrative healthcare decision, and the alleged implied-in-fact contract between plaintiffs and Valley -- the only alleged source of mutual obligation to which the implied covenant of good faith and fair dealing could properly attach to is the implied-in-fact contract.  (pp. 38-41)

3

4. The Court explains how the evidence in the record, taken in the light most favorable to plaintiffs, was sufficient to raise a factual dispute as to whether there was an implied-in-fact contract between plaintiffs and Valley and whether Valley acted in bad faith in revoking certain of plaintiffs' privileges, such that the claim properly survived summary judgment. Although the claim properly reached the jury, however, the jury charge and verdict sheet did not properly instruct the jurors on the elements of the claim. Notably, the jury was given no law on how to measure Valley's defense to the implied covenant claim, and consideration of the jury charge as a whole raises significant doubt as to whether the jury found the underlying contract for plaintiffs' implied covenant claim to be some implied or oral agreement beyond the Bylaws, or just the Bylaws. The jury could have come to a different result had it been correctly instructed on the contract claims, especially because the underlying contract on the implied covenant claim -- purportedly an endless right to treat "unassigned" ER patients with special tools -- was not in writing. (pp. 41-52)

5. The emails between Valley and its general counsel for the purpose of legal advice, rather than business purposes, are protected by the attorney-client privilege. Valley did not place its general counsel's pre-litigation legal advice "in-issue," nor did it call its general counsel as a witness. Valley's inadvertent disclosure of the emails -- allegedly consisting of 352 pages -- in the course of an exchange of about 57,000 documents in roughly two months did not amount to waiver of the attorney-client privilege. The parties' discovery agreement's claw-back provision anticipated precisely such an inadvertence. And admission of the emails into evidence was not harmless. Select emails in many ways became the centerpiece of plaintiffs' case. On remand, if plaintiffs attempt to introduce emails from the batch Valley attempted to claw back, the judge should conduct a document-by-document review to determine whether the emails are privileged and thus not admissible. (pp. 52-58)

6. Certain comments by plaintiffs' trial counsel in summation were improper. Plaintiffs' trial counsel knew that Valley had evidence of sixty cases of patient transfers. The summation remarks implied, however, that there was evidence of only two cases of patient transfers, and that inaccurate statement impacted Valley's contention that it made a valid healthcare decision. (pp. 58-61)

7. The cumulative errors here deprived Valley of a fair trial and warrant a new one. The Court sets forth specific guidance for the remand proceedings. (pp. 61-62)

**REVERSED. The verdict on the implied covenant claim is VACATED, and the matter is REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and NORIEGA join in JUSTICE FASCIALE's opinion.**

# SUPREME COURT OF NEW JERSEY
## A-52 September Term 2022
### 087469

Comprehensive
Neurosurgical, P.C., d/b/a
North Jersey Brain and
Spine Center, Patrick A.
Roth, MD, Roy D. Vingan,
MD, George J. Kaptain,
MD, Daniel E. Walzman,
MD, Hooman Azmi, MD,
Harshpal Singh, MD,
Kangmin Daniel Lee, MD,
Reza J. Karimi, MD, Bruce
C. Zablow, MD, Ugo
Paolucci, MD, and
Mohammed Faraz Khan,
MD,

Plaintiffs-Respondents,

v.

The Valley Hospital,
The Board of Trustees
of the Valley Hospital,
and Valley Hospital
President Audrey Meyers,

Defendants-Appellants,

and

Neurosurgical Associates
of New Jersey, P.C., and
Anthony D'Ambrosio, MD,

1

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| November 29, 2023 | April 16, 2024 |

Christopher S. Porrino argued the cause for appellants (Lowenstein Sandler, and Wollmuth Maher & Deutsch, attorneys; Christopher S. Porrino, of counsel and on the briefs, and Robert G. Nuse and R. Scott Thompson, on the briefs).

Peter G. Verniero argued the cause for respondents (Sills Cummis & Gross, attorneys; Peter G. Verniero, Joseph B. Fiorenzo, and Stephen M. Klein, of counsel and on the briefs, and James M. Hirschhorn and Michael S. Carucci, on the briefs).

Ross A. Lewin argued the cause for amicus curiae New Jersey Hospital Association (Faegre Drinker Biddle & Reath, attorneys; Ross A. Lewin, of counsel and on the brief).

Ross A. Lewin submitted a brief on behalf of amicus curiae American Hospital Association (Faegre Drinker Biddle & Reath, attorneys; Ross A. Lewin, of counsel and on the brief).

Daniel B. Frier submitted a brief on behalf of amici curiae The Medical Society of New Jersey and the American Medical Association (Frier Levitt, attorneys; Daniel B. Frier, Todd Mizeski, Nicole M. DeWitt, Theresa M. DiGuglielmo, and Conor R. McCabe, on the brief).

In this appeal, The Valley Hospital (Valley) challenges a jury verdict in favor of a group of eleven neurosurgeons and their practice group, Comprehensive Neurosurgical, P.C., d/b/a/ North Jersey Brain & Spine Center (collectively, plaintiffs).  A jury awarded plaintiffs $24,300,000 in damages based on their claim that Valley did not deal with them fairly or act in good faith when it granted another group of neurosurgeons exclusive privileges in areas for which plaintiffs had held privileges.

Valley first argues that the trial judge should have granted summary judgment in its favor because courts traditionally defer to hospitals' administrative healthcare policy decisions that "genuinely serve[] a legitimate public-health objective," Berman v. Valley Hospital, 103 N.J. 100, 107 (1986), "including the selection of [its] medical staff," Desai v. St. Barnabas Medical Center, 103 N.J. 79, 90 (1986).  Valley argues in the alternative that substantial cumulative errors tainting the jury verdict require a new trial.  According to Valley, the jury was improperly permitted -- through an unclear verdict sheet and instructions -- to find that Valley had breached an implied covenant of good faith and fair dealing.  Valley also contends that the jury verdict was tainted by the erroneous admission into evidence of privileged

emails and by misleading remarks that plaintiffs' attorney made in summation when he emphasized Valley's lack of evidence on an issue despite knowing that such evidence existed.

Although we find that plaintiffs' good faith and fair dealing claim properly survived summary judgment, we agree that the jury was not correctly charged or asked to rule on that claim. The trial judge failed to instruct the jury that the only underlying contract to which the implied covenant could attach to had to be one beyond the rights afforded by Valley's Medical Staff Bylaws (the Bylaws). Adding to the significant uncertainty created by the jury charge and verdict sheet are the improper admission into evidence of the privileged emails and the improper remarks by plaintiffs' attorney.

Despite the deference with which we consider jury verdicts, we find that those errors, cumulatively, had the capacity to lead the jury to reach a verdict it would not have otherwise reached and deprived Valley of a fair trial. Accordingly, we reverse the appellate court's judgment, vacate that part of the verdict on plaintiffs' implied covenant of good faith and fair dealing claim, and remand for further proceedings consistent with this opinion.

I.

We derive the factual overview that follows from the evidence and testimony presented at trial. Mindful that a substantial retrial will follow our

4

decision, we endeavor to attribute differing accounts to the parties that made them, and also emphasize that no factual findings may be inferred from the overview presented here.

Plaintiffs -- initially a group of two neurosurgeons -- joined the Valley Hospital Medical Staff Organization (Medical Staff) in 2003.[1]  Upon arrival, plaintiffs received "core privileges" allowing them to perform common neurosurgery procedures, and "admitting privileges" permitting them to admit their already-established patients into Valley.  Valley also gave plaintiffs the right to "cover" the Emergency Room (ER) by treating "unassigned" ER patients who arrive to the ER on an emergency basis and are not any other neurosurgeon's established patient.  Plaintiffs' practice at Valley primarily derived from treating those "unassigned" ER patients.

Over the following years, plaintiffs expanded their practice from two to up to twelve neurosurgeons.  Additional neurosurgeons and practice groups also obtained privileges and joined the Medical Staff.  For example, Dr.

---

[1]  Valley's Medical Staff is an organization "responsible to the governing body of the hospital."  See N.J.A.C. 8:43G-16.1 (titled "Medical staff structural organization").

Anthony D'Ambrosio of the Columbia Neurosurgical Network-NJ (the Columbia Group) joined the Medical Staff in July 2007.[2]

With plaintiffs' help, Valley's programs and facilities grew during that time as well. Plaintiffs helped establish Valley's "Spine Center," contributed to the creation of Valley's "Neuro-oncology program," and introduced specialized neurosurgical equipment, such as the "Biplane" angiography system and the "Gamma Knife" radiosurgery procedure, which allowed the neurosurgeons to perform minimally invasive surgeries rather than "opening" patients' skulls. Valley granted "specialized privileges" to the physicians in plaintiffs' practice group who focused their craft on treating stroke and aneurysm patients. The "specialized privileges" authorized them to use the "Biplane" and "Gamma Knife" equipment they helped implement.[3]

By 2008, Valley had opened its "Neuroscience Center of Excellence," which included a "Comprehensive Stroke Center." According to testimony by a Valley executive, Valley sought to enhance its programs further by creating a

---

[2] The record does not clearly reflect whether other physicians in the Columbia Group joined at the same time as Dr. D'Ambrosio. Further, a solo practitioner, Dr. Duncan Carpenter, and a third practice group, Bergen Passaic Neurosurgery, also joined Valley at some point prior to 2015.

[3] The record is unclear as to how many members of plaintiffs' practice group were granted "specialized privileges" for those devices and how many additional surgeons were granted the same privileges.

"Neuroscience Strategic Planning Committee" tasked with "implementing alignment strategies" between Valley and the neurosurgeons on the Medical Staff. One such "alignment strategy" included a possible co-management agreement.[4] The Valley executive testified that the Columbia Group was "pretty excited" about the possibility of a co-management structure while plaintiffs' group "was skeptical."

Meanwhile, six miles down the road from Valley, Hackensack University Medical Center took over a hospital that had previously closed and began the process of reopening it as "Hackensack University Medical Center at Pascack Valley" (Hackensack). Valley launched several attempts to prevent that reopening, including a lawsuit where it relied principally on N.J.S.A. 26:2H-8 to argue there was no "need" to open a new medical facility in the area. Valley ultimately lost that suit on appeal, and Hackensack opened around June 2013. Hackensack thereafter granted plaintiffs privileges to treat patients at Hackensack. In a meeting with plaintiffs, Valley's President and CEO, Audrey Meyers, expressed that she disliked how plaintiffs simultaneously held privileges and leadership positions at both Valley and Hackensack.

---

[4] Generally, a co-management agreement is an agreement between hospitals and physicians to align with one another and to work with each other toward common goals.

7

According to Valley, its satisfaction with plaintiffs' performance deteriorated over time, exacerbated by concerns over plaintiffs' relationship with Hackensack. In 2014, Valley's Vice President of Planning and Government Relations, Gail Callandrillo, along with Valley's data analysis team and one independent consultant, evaluated Valley's neurosurgical services. Specifically, they compared "data relating to volume, quality, utilization and complication rates" between patients cared for by the Columbia Group and plaintiffs. That analysis served as the basis for a study authored by Callandrillo and outside counsel, which the parties have called the "White Paper."

Valley's White Paper stated that plaintiffs had lower inpatient and outpatient volumes, performed fewer neurosurgery procedures at Valley, maintained a higher leakage rate,[5] and overall rendered a lower quality of patient care than did the Columbia Group. The White Paper also suggested that plaintiffs had engaged in so-called "patient transfers," which involved "accruing patients from [Valley's] Emergency Department consult and subsequently performing [] procedures at another facility, presumably [Hackensack] given their strong connection to that organization." After

---

[5] "Leakage" is a term used to describe when a hospital's patient obtains healthcare outside the hospital network. One consequence of leakage is loss of revenue.

8

ultimately concluding that the Columbia Group outperformed plaintiffs, the White Paper recommended that Valley enter into an exclusive agreement with the Columbia Group (the Exclusive Agreement).

Meyers and the Staff Development Committee of the Valley Board of Trustees then presented the White Paper to the entire Valley Board of Trustees, recommending that Valley enter into the Exclusive Agreement. The Board agreed, and in December 2015, Valley and the Columbia Group signed the Exclusive Agreement providing the Columbia Group with the exclusive right over Valley's "unassigned" ER patients, as well as exclusive access to the "Gamma Knife" and "Biplane" equipment.

Thereafter, Meyers notified plaintiffs about the Exclusive Agreement. She explained that the Columbia Group was given exclusive rights to Valley's "unassigned" ER patients but that plaintiffs were still permitted to admit and treat their established patients. Plaintiffs demanded Valley "immediately revoke" the Exclusive Agreement and asserted that its practical effect revoked their privileges. Plaintiff Patrick Roth testified that being cut off from treating "unassigned" ER patients meant that plaintiffs' practice was "dead in the water" because "all strokes are emergency by definition" and therefore most stroke patients are "unassigned."

9

The parties dispute whether plaintiffs complied with the procedural requirements for requesting a hearing in accordance with the Bylaws. Those Bylaws, initially approved by Valley's governing body in 1984 and amended twenty-seven times since, govern procedures for physician appointment and reappointment, set physician qualifications, provide for the conferral of hospital privileges, and afford certain procedural rights, including a hearing under certain circumstances. As relevant here, if promptly requested in writing, Medical Staff members may be entitled to a hearing under the Bylaws upon receipt of a "notice of a corrective action . . . which if ratified . . . would adversely affect the [member's] appointment, reappointment to the Medical Staff, or <u>clinical privileges on the Medical Staff</u>." (emphasis added).

Without conducting a hearing, Valley responded that its actions did not constitute a revocation of plaintiffs' privileges and refused to "immediately revoke" the Exclusive Agreement.

II.

A.

In late January 2016, plaintiffs filed a verified complaint and order to show cause (OTSC) in the Chancery Division. Plaintiffs alleged that

> [t]he Valley Defendants have unilaterally sought to terminate the rights and Medical Staff privileges of [plaintiffs] for entirely improper reasons, including: (1) [Meyers] sought to punish perceived disloyalty

10

because [plaintiffs] professionally associated with Meyers' rival at Hackensack University Medical Center; and (2) to enforce Meyers' demand to exclude Medicaid and similar financially distressed patients from Valley Hospital. To accomplish this wrongful objective, they determined to push out [plaintiffs] by contracting with [the Columbia Group] to exclusively perform nearly all of the procedures [plaintiffs] have developed at Valley. Not only were the Valley Defendants motivated by illegal purposes -- in flagrant disregard of this state's public policy, which requires that hospital's actions further legitimate patient-care needs -- but the Valley Defendants also concocted an illegal scheme to deny [plaintiffs] even the right to be heard before their privileges are terminated, as required by the [Bylaws].

In the Chancery Division, plaintiffs sought to enjoin Valley from allegedly terminating their hospital privileges and from restricting their ability to treat "unassigned" ER patients.

On the initial return date of the OTSC, the chancery judge did not enter restraints and instead temporarily retained jurisdiction over the entire matter while the parties conducted expedited discovery. The parties jointly consented to a protective order enabling either party, if necessary, to "claw back" any documents that might be inadvertently produced. Over the next approximate two months of discovery, the parties exchanged over 57,000 documents. Two significant events transpired during the exchange of discovery.

The first involved a set of emails that Valley produced. Valley invoked the protective order to "claw back" emails it claimed to have inadvertently

11

produced. Valley contended that the emails contained legal advice from Valley's general counsel, Robin Goldfischer, including suggestions about how to provide proper documentary support for the hospital's decision to enter into the Exclusive Agreement.

Plaintiffs refused to return the requested emails and instead filed a motion seeking to retain them. The chancery judge reviewed the emails in-camera and concluded that they were protected by the attorney-client privilege. The judge determined, however, that Valley waived the privilege by placing the White Paper "in-issue" and by disclosing the emails in discovery. Despite noting that plaintiffs could access the information in the emails "in a less intrusive manner," the judge granted plaintiffs' motion and allowed them to keep the emails.

The second significant result of discovery was that Valley found evidence tending to support its suspicion that plaintiffs were engaging in patient transfers. Documents produced by plaintiffs revealed that sixty cases of patient transfers occurred between 2012 and 2014, tending to support what the White Paper suggested was occurring.

The chancery judge denied plaintiffs' application for a permanent injunction and transferred the case to the Law Division. Valley later

unsuccessfully sought reconsideration of the order permitting plaintiffs to keep the emails.

B.

1.

In the Law Division, plaintiffs amended the complaint that they filed in the Chancery Division. In their amended pleading, they alleged that Valley (1) engaged in an invalid exercise of its discretionary healthcare powers (the "Berman" claim); (2) violated the doctrine of fundamental fairness; (3) breached the Bylaws by failing to provide a hearing (the purported "breach of contract" claim); (4) breached the implied covenant of good faith and fair dealing; (5) tortiously interfered with prospective economic benefit; and (6) committed trade libel.[6]

The parties then moved for summary judgment. The trial judge denied those motions, finding that there existed genuine issues of material fact, primarily pertaining to whether Valley properly terminated plaintiffs' privileges.

---

[6] Plaintiffs also named the Board of Trustees of the Valley Hospital, Meyers, the Columbia Group (now called Neurosurgical Associates of New Jersey, P.C.), and Dr. D'Ambrosio as co-defendants. Plaintiffs' claims against the Columbia Group and Dr. D'Ambrosio included allegations that they tortiously interfered with prospective economic advantage and tortiously interfered with a contract. All claims against the named co-defendants were dismissed on summary judgment.

13

Two claims reached the jury: (1) a breach of contract claim seeking money damages, in which plaintiffs alleged that Valley had breached the Bylaws by failing to provide them with a hearing; and (2) plaintiffs' breach of the implied covenant of good faith and fair dealing claim, for which they also sought money damages. The trial judge determined that plaintiffs' challenge to Valley's decision to enter into the Exclusive Agreement -- i.e., the "Berman" claim -- was "subsumed" within the implied covenant claim because the "same arguments" could be used for both. He therefore treated the Berman claim and the breach of the implied covenant of good faith and fair dealing claim as a single count. All other claims were dismissed.

2.

During the trial, plaintiffs presented arguments about Valley's alleged breach of the Bylaws as well as the alleged impropriety of Valley's administrative healthcare decision. Specifically, plaintiffs argued that Valley's decision to enter into the Exclusive Agreement was a spiteful rebuke for plaintiffs' relationship with Hackensack. According to plaintiffs, the White Paper was not forward-looking research designed to assess Valley's status and to determine what changes would best allow Valley's neuroscience department to meet the needs of the public. Instead, plaintiffs claimed the White Paper

14

was a "sham" document prepared to justify, retroactively, Valley's decision to punish plaintiffs because of perceived disloyalty to Valley.

Plaintiffs also presented testimony and evidence supporting the mutual obligations that plaintiffs alleged that they and Valley had agreed to. According to plaintiffs, those obligations arose from (1) Valley's persuasion and encouragement of plaintiffs to join the Medical Staff at a time when its neuroscience department was relatively undeveloped; (2) plaintiffs' agreement to join the Medical Staff believing that Valley wanted plaintiffs to help transform the hospital into a "Neuroscience Center of Excellence"; and (3) plaintiffs' continuing efforts to meet Valley's goals, which included research, travel, and applying for State funding support. Dr. Roth testified at trial that in return, plaintiffs expected to run Valley's ER "forever"; he explained to the jury:

> I looked at [Valley's request] as a quid pro quo, meaning you know, we're going to build this [ER], we're going to modernize it, we're going to stop this flow of patients from outside [Valley] to [other hospitals] and . . . we're going to do a great job of manning [the ER] and . . . in return it's ours to lose.

Valley opposed the breach of contract claim, arguing that it was not required to grant a hearing under the Bylaws. On plaintiffs' breach of the implied covenant claim, Valley denied that the Bylaws would somehow

15

guarantee plaintiffs privileges in perpetuity, regardless of the best interests of the hospital or the public. Moreover, Valley defended its decision to enter into the Exclusive Agreement as a valid exercise of hospital administrative discretion -- due deference under Berman and Desai -- based on an analysis of patients' needs and of the practice groups' respective performances.

In developing its defense, Valley attempted to show that its concerns about plaintiffs diverting patients from Valley to Hackensack were grounded in reality rather than animus. Valley therefore attempted to question a witness about the transfers of patients to Hackensack. Plaintiffs' counsel objected to that line of questioning, arguing that Valley's current knowledge of the transfers -- derived during discovery -- is "irrelevant" to prove that it acted in good faith back when it entered into the Exclusive Agreement years before. The trial judge sustained plaintiffs' objection. Valley's counsel then requested that plaintiffs "be precluded from arguing [that the transfers] didn't happen." The transcript reflects that the trial judge did not respond to that request.

In summation, plaintiffs' counsel attempted to discredit Valley's argument about the patient transfers by noting that Valley only mentioned two such instances. Plaintiffs' counsel then went on to ask the jury: "[D]o you think that if there were more, [Valley] would have presented them to us? Do you think if they existed, they would have found their way into the [White

16

Paper]?"  (emphases added).  Valley did not object to the comments.  The summation transcript also reveals that plaintiffs' counsel referred to the privileged emails at least three times during summation.

3.

During the jury charge conference, there was considerable debate among the parties and the trial judge about how to instruct the jury on contract formation when medical staff bylaws are involved.  Plaintiffs asked that the jury be instructed according to Joseph v. Passaic Hospital Ass'n, 26 N.J. 557 (1958), to prevent confusion because "[t]here is no offer, acceptance, consideration in the context of the [Bylaws]."[7]  After a dialogue over the meaning of Joseph, the trial judge stated that plaintiffs "still need to prove the existence of a contract.  And the mere fact that there are [Bylaws] doesn't mean that they had a contract for what's at issue here at trial."

Ultimately, as to plaintiffs' claim that Valley violated the Bylaws by withdrawing their privileges without a hearing, the judge instructed the jury that,

> [t]o establish [their] contract claim against the defendant[,] plaintiffs must prove that, one, the parties entered into a contract containing certain terms.

---

[7]  In Joseph, this Court held that, under the hospital's medical staff bylaws, the plaintiff physician was entitled to a hearing before the hospital revoked his privileges.  26 N.J. at 570.

17

Two, the plaintiff[s] did what the contract required the plaintiffs to do.

Three, the defendant did not do what the contract required the defendant to do. This failure is called a breach of the contract.

Four, the defendant's breach or failure to do what the contract required caused a loss to the plaintiffs.

In his more detailed instructions on contract formation principles, the judge explained:

There is no requirement that a contract be in writing, that it be dated, or that it be signed by either party. It can be entirely oral or it can [be] partly oral and partly in writing. A contract can be made of several different documents if the parties intended that their agreement would include the various documents together.

Express or implied contract. A contract may be expressed, or implied, or it may be a mixture of the two. An expressed contract is one in which the parties have shown their agreements by words. Expressed contracts include those in which the parties have orally stated the terms to each other or have placed the terms in writing. An implied contract is one in which the parties show their agreement by conduct. For example if someone provides services to another under circumstances that do not support the idea that they were donated or free[,] the law implies an obligation to pay the reasonable value of services. Thus, an implied contract is an agreement and for -- from the parties conduct or from the circumstances surrounding their relationship.

In other words, a defendant may be obligated to pay for services rendered for defendant by plaintiff if the circumstances are such that the plaintiff reasonably expected the defendant to compensate plaintiff and if a

18

reasonable person in defendant's position would know that plaintiff was performing the services expecting that the defendant would pay for them.

He continued by describing to the jury the weight to be given to the parties' reasonable expectations and course of dealing in determining the terms of a contract.

The judge twice instructed the jurors about plaintiffs' "theory" on their breach of contract claim:

> Plaintiffs claim the following terms were part of the contract. That a hearing was provided in The Valley Hospital bylaws for the purpose of resolving any matter bearing on professional privileges, competency, personal conduct, or any other matters involving or related to the hospital bylaw or the medical staff bylaw rules and regulations.
>
> Plaintiff[s] further claim that the parties intended this to mean that the plaintiffs were entitled to a hospital hearing before The Valley Hospital entered an agreement with [the Columbia Group] to make [the Columbia Group] the exclusive provider at The Valley Hospital for Emergency Department on-call duties for unassigned patients, gamma knife services, and neurointerventional biplane angiography services.
>
> The Valley Hospital contends that the bylaws did not require a hearing to be held in these circumstances because the decision to enter the agreement with [the Columbia Group] was a hospital-wide decision.

This first set of instructions on plaintiffs' theory of breach thus focused exclusively on the Bylaws as the underlying contract, despite the judge's

19

instruction to the jury on the law governing express or implied contracts and the parties' expectations and course of dealings.  But when the judge next instructed the jury on plaintiffs' "claims of breach," he added a statement that plaintiffs claimed that "defendant breached the contract <u>by conducting a sham study</u> and failing to provide them with a hospital hearing prior to terminating their access to the Emergency Department on-call schedule for unassigned patients, gamma knife services, and neurointerventional biplane angiography services."  (emphasis added).

The trial judge then provided the following instructions about the allegation that Valley separately breached the implied covenant of good faith and fair dealing:

> Implied terms, covenant of good faith, and fair dealing. The plaintiffs . . . in this case contend that [Valley] breached what is known as the implied covenant of good faith and fair dealing.  In addition to the expressed terms of a contract[,] the law provides that every contract contains an implied covenant of good faith and fair dealing.  This means that even though not specifically stated in the contract it is implied or understood that each party to the contract must act in good faith and deal fairly with the other party in performing or enforcing the terms of the contract.
>
> . . . .
>
> The plaintiff[s] in this case claim[] that the defendant Valley breached the implied covenant [of] good faith and fair dealing by encouraging plaintiffs to join Valley and take over the Emergency Department call schedule

20

[and] invest time, resources, and efforts to modernize the practice of neurosurgery at Valley, but then unfairly and dishonestly barring plaintiffs from using the tools and facilities they developed.

Plaintiffs further contend that Valley breached the covenant of good faith by making a predetermined decision to exclude plaintiffs[,] creating a sham study by changing metrics to achieve its intended goal of skewing [plaintiffs'] results to show poor quality[,] and negotiat[ing] [a] contract with the [Columbia] Group before the study even began. To prevail on this claim[,] the plaintiff[s] must prove each of the following three elements by a preponderance of the evidence.

First, the plaintiff[s] must prove that some type of contract existed between the parties. There can [be] no breach of the covenant of good faith and fair dealing unless the parties had a contract.

Second, the plaintiff[s] must prove that the defendant acted in bad faith with the purpose of depriving the plaintiff[s] of rights or benefits under the contract.

Third, the plaintiff[s] must prove that the defendant's conduct caused the plaintiff[s] to suffer injury, damage, loss, or harm.

Express or implied contract. If you find that a contract existed between the parties, you must then determine whether the defendant violated the implied covenant of good faith and fair dealing. Did the defendant act in bad faith with the intent to deprive the plaintiff[s] of rights or benefits under the contract? As to this element you must decide whether the defendant acted with bad faith to interfere with the plaintiffs' right to receive benefits of the contract.

. . . .

21

> In summary, if you find that the plaintiff[s] [have] proven by a preponderance of the evidence, one, the existence of some type of contract, two, that the defendant although acting consistently with the contract's terms acted in bad faith with the intent to deprive the plaintiff[s] of [their] reasonable expectations under the contract, and, three, the plaintiff[s] sustained loss as a result of such action, then you must find for the plaintiff[s].

The judge concluded his instructions on plaintiffs' two claims -- the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim -- by providing guidance as to the award of damages, specifying that damages were available for both the breach of contract and breach of covenant claim.

4.

The verdict sheet presented the jury with two claims, each determined by three questions.

The first three questions on the six-question verdict sheet related to what the sheet labeled as plaintiffs' "Breach of Contract" claim:

> 1. Have the plaintiffs, Comprehensive Neurosurgical PC, proven by a preponderance of the evidence that there was an enforceable contract between plaintiffs and defendants?
>
> If "yes" proceed to Question # 2, If "no" proceed to Question # 4.

22

2. Did the defendants breach the contract with the plaintiff[s], Comprehensive Neurosurgical PC, by terminating the services without holding a hearing?

If "yes" proceed to Question # 3, If "no" proceed to Question # 4.

3. What amount of damages, if any, [have] the plaintiff[s], Comprehensive Neurosurgical PC established that the defendant owe[s] them for any breach of contract?

The jury voted 6-0 that there was a contract between plaintiffs and Valley (question one) and then voted 5-1 that Valley did not breach that contract by declining to hold a hearing before revoking plaintiffs' privileges (question two). The jurors thus found no cause of action on the breach of contract claim and did not reach question three concerning damages on that claim.

Significantly, after question three, the verdict sheet instructed the jurors as follows:

If you have awarded damages in Question #3, then skip Questions #4, #5, and #6[.]

Thus, if the jury awarded damages on the breach of contract claim -- failure to grant a hearing under the Bylaws -- then the jurors were instructed not to reach plaintiffs' second claim dealing with the implied covenant of good faith and fair dealing. Because the jury did not award damages in question three, the jurors considered the remaining three questions on the verdict sheet, presented

23

under a separate heading entitled "Breach of Covenant of Good Faith and Fair Dealing":

> 4. Do you find by a preponderance of the evidence that the Valley Hospital and Comprehensive Neurosurgical PC entered into a contract?
>
> If "yes" proceed to Question #5, If "no" cease your deliberations.
>
> 5. Do you find by a preponderance of the evidence that the defendant, The Valley Hospital violated the Covenant of good faith and fair dealing with the purpose of depriving the plaintiffs, Comprehensive Neurosurgical, PC of their reasonably expected rights or benefits under the contract?
>
> If "yes" proceed to Question #6, If "no" cease your deliberations.
>
> 6. What amount of damages, if any, [have] the plaintiff[s], Comprehensive Neurosurgical, PC established that the defendant, The Valley Hospital owe[s] them for the violation of the covenant of good faith and fair dealing?

The jury answered questions four and five in the affirmative by a 6-0 vote and, in question six, the jury awarded plaintiffs $24,300,000 in damages by a 5-1 vote.

Valley moved for a judgment notwithstanding the verdict or in the alternative, a new trial on the implied covenant claim because according to Valley, plaintiffs had no reasonable expectations under the Bylaws that they

24

would have privileges in perpetuity. The judge denied those motions, reasoning that

> [t]he jury was presented with testimony from multiple witnesses regarding the <u>history of the relationship between the two parties and the extent of that relationship [--] which went beyond the bounds of the [B]ylaws</u>. The jury was within its rights to find that [plaintiffs] had a reasonable expectation of continuing this relationship with [Valley] in much the same way as it had since 2005.
>
> [(emphasis added).]

C.

Valley appealed, challenging both the denial of summary judgment and the verdict in favor of plaintiffs on the implied covenant of good faith and fair dealing claim. Valley further argued that the verdict was legally deficient and tainted by (1) reference to Valley's privileged emails, which it should have been permitted to claw back, and (2) improper summation remarks by plaintiffs' counsel about the absence of evidence of patient transfers, given that such evidence undisputedly existed but was not admissible.

The Appellate Division affirmed both the trial judge's denial of summary judgment and the jury's verdict. The appellate court found that Valley was not entitled to summary judgment on the implied covenant claim, reasoning that the covenant of good faith and fair dealing could have attached to an underlying contract beyond the rights afforded by the Bylaws. The

25

appellate court also found that the jury was not tainted by the admission into evidence of privileged attorney-client emails or the challenged summation comments.

## D.

We granted Valley's petition for certification, limited to the consideration of plaintiffs' implied covenant claim, as well as "whether defendants waived the attorney-client privilege for certain communications, and whether plaintiffs' counsel made improper or misleading comments during summation about transferring patients that require a new trial." 254 N.J. 210 (2023). We also granted motions from the New Jersey Hospital Association (NJHA), the American Hospital Association (AHA), and the Medical Society of New Jersey and the American Medical Association (jointly, MSNJ) to appear as amici curiae.

## III.

Valley argues it is entitled to summary judgment on the implied covenant of good faith and fair dealing claim. It maintains that the Bylaws cannot serve as an underlying contract and that the implied covenant claim is duplicative of the breach of contract claim. If the Court disagrees, Valley requests that we remand for a new trial because the jury was substantially tainted by the erroneous admission of privileged attorney-client emails and by

26

improper summation remarks. At oral argument before us, Valley conceded that every contract has an implied covenant of good faith and fair dealing but suggested that the jury misunderstood that such an underlying contract could be the Bylaws.

Plaintiffs asserted at oral argument that their implied covenant claim was properly before the jury and that the jury was appropriately charged on that claim. Acknowledging that there must be an underlying contract to make such a claim, plaintiffs argue that the parties' "historical relationship" supports the existence of an implied contract, one that goes beyond the rights afforded under the Bylaws. Plaintiffs reiterate that Valley waived the attorney-client privilege by placing the White Paper "in-issue" and that Valley's disclosure of the emails containing legal advice to and from Goldfischer was not inadvertent. Alternatively, if there was no waiver and the summation comments are deemed improper, plaintiffs argue that any error is harmless given the "extensive remaining evidence."

NJHA and AHA support Valley's position. NJHA argues that a hospital's administrative healthcare decision cannot be challenged on contract-based theories seeking monetary relief. Allowing otherwise, NJHA claims, would undermine the broad deference courts afford a hospital's administrative healthcare decision under Berman. AHA emphasizes that medical staff bylaws

27

organize the medical staff into a cohesive unit and that upholding this "unprecedented" verdict would impair a hospital's ability to make decisions for patients and communities.

MSNJ supports plaintiffs' arguments and urges that hospitals should be held "to the standard of good faith and fair dealing" to prevent "abuse" of the credentialing process because such "abuse" would harm patient care, increase medical costs, unfairly question qualified physicians, and interfere with physicians' medical practices. MSNJ asserts that providing an exclusive agreement to a loyal practice group, while punishing a non-loyal group, is contrary to a nonprofit hospital's charitable purpose and is harmful to the healthcare system.

IV.

The main issue in this case is the viability of plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

A covenant of good faith and fair dealing is implied by law into every contract. Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005). The implied covenant of good faith and fair dealing requires the "parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." Id. at 224-25 (emphasis added)

28

(quoting <u>Palisades Props., Inc. v. Brunetti</u>, 44 N.J. 117, 130 (1965)).  Although "[p]roof of 'bad motive or intention' is vital to" the claim, <u>id.</u> at 225 (quoting <u>Wilson v. Amerada Hess Corp.</u>, 168 N.J. 236, 251 (2001)), such proof is not enough on its own.  Rather, a plaintiff must demonstrate that the defendant's alleged misdeeds prevented the plaintiff from enjoying the full benefit of the terms of a particular bargain.  <u>See id.</u> at 226 ("A plaintiff may be entitled to relief under the covenant if its <u>reasonable expectations</u> are destroyed when a defendant acts with ill motives and without any legitimate purpose." (emphasis added)).

As this appeal comes to us, the central dispute concerns whether there is a contractual basis for plaintiffs to claim that their reasonable expectations were left unmet due to Valley's alleged unfair dealing.  Valley argues that there is no underlying contract to which plaintiffs' breach of covenant claim could attach.  Valley therefore contends that the claim should never have reached the jury.  Valley claims, in the alternative, that the jury's verdict cannot stand because the jury was never properly instructed that it must find a valid contract between the parties to find a breach of the implied covenant of good faith and fair dealing.

Three separate bases have been tied to Valley's alleged obligation to act in good faith:  (1) the Bylaws; (2) Valley's administrative hospital decision to

29

enter into the Exclusive Agreement, which in essence revoked plaintiffs' privileges to use the "Gamma Knife" and "Biplane" technologies and their right to treat "unassigned" ER patients; and (3) an alleged oral or implied contract between the parties that, according to plaintiffs, led them to join Valley and to strive, over the course of a decade, to build and enhance Valley's neuroscience department, while expecting to indefinitely maintain their privileges and rights absent a <u>valid</u> administrative healthcare decision providing otherwise. Those three sources are entirely distinct from one another, and their separate characteristics have important consequences for the types of claims that can be brought based on each source, the proofs necessary to prove those claims, and the types of relief available for each claim if proven.

We therefore begin our discussion of the breach of covenant claim by reviewing the nature of the claims that can arise under a hospital's medical staff bylaws and, separately, under a hospital's administrative healthcare decision, as well as the showing necessary to support the existence of an implied or oral contract.

## A.

### 1.

Although medical staff bylaws impose reciprocal legal obligations and rights between those who agreed to be bound -- obligations that have been and will continue to be reviewed and enforced by a court if necessary -- we hold that those obligations are not technically "contractual" in nature. We clarify that while "[t]hose bound together in the common enterprise have reciprocal rights and duties laid down in the Constitution and [bylaws]," Joseph, 26 N.J. at 569, medical staff bylaws cannot serve as an underlying contract to support an alleged breach of an implied covenant of good faith and fair dealing claim, nor can a violation of those bylaws support an independent claim for money damages.

Medical staff bylaws provide internal rules and procedures that govern the medical staff. Like other states, New Jersey requires hospitals to adopt medical staff bylaws. See N.J.A.C. 8:43G-16.1(a) ("Bylaws governing all medical staff members shall be implemented."); Belmar v. Cipolla, 96 N.J. 199, 208 (1984) ("[H]ospitals must adopt rules, regulations, and bylaws concerning procedures for admission to staff membership . . . ."). In addition to establishing physician qualifications, medical staff bylaws afford certain procedural rights to physicians whose hospital rights and privileges are

31

negatively impacted.  But more importantly, medical staff bylaws ensure that hospitals and physicians provide quality and ethical healthcare.

However, the fundamental elements of contract formation are missing in the context of medical staff bylaws -- there is no mutual assent, offer and acceptance, or consideration.  See Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (providing the requirements for an enforceable contract and noting that when "parties agree on essential terms and manifest an intention to be bound by those terms," there is an enforceable contract).  Here, there is no evidence that the parties negotiated or engaged in the "bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation" in the adoption of Valley's Medical Staff Bylaws.  Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 289 (1988).  The Bylaws existed long before plaintiffs joined the Medical Staff.

Moreover, plaintiffs mistakenly relied upon Joseph to support their contention that medical staff bylaws create a legally binding contract and may otherwise be used to support a contract claim seeking money damages.  Such a literal reading is misplaced.  In Joseph, a surgeon sued a hospital seeking, among other relief, reinstatement of his "emeritus staff" status.  26 N.J. at 561.  In remanding his equity suit, this Court held that the hospital's constitution

and medical staff bylaws provided the surgeon with a right to a hearing, but because the hospital failed to honor that right, the hospital's action was "null." Id. at 570, 575.

In reaching that conclusion, the Court stated that

> [t]hose bound together in the common enterprise have reciprocal rights and duties laid down in the Constitution and [bylaws] and such as are inherent in the nature of the undertaking; and judicial interposition may be had to avert unreason and unconscionable and excessive action, such as would offend against natural justice. The Association's Constitution and [bylaws] are essentially conventional; the compact derives from the common consent of the parties and is limited accordingly.
>
> [Id. at 569 (citations omitted).]

As emphasized, medical staff bylaws do impose binding obligations -- such as the hospital's obligation to afford a hearing in certain settings -- and "judicial interposition may be had to avert unreason and unconscionable and excessive action." Ibid. But those obligations do not give rise to a traditional contract, to a claim for the traditional contract remedy of damages, or to a separate breach of the implied covenant claim.

Instead, when a hospital violates its medical staff bylaws, equitable relief may be available. Thus, plaintiffs here, like the plaintiff in Joseph, would have been entitled to a hearing if Valley had violated the Bylaws by failing to provide one in the first place. But the Bylaws include no promise

33

that plaintiffs' privileges would never be limited, and they therefore offer no basis for the equitable restoration of plaintiffs' privileges, let alone monetary damages for any alleged bad faith actions in altering their privileges. And here, the jury expressly found that Valley did not violate the Bylaws.[8]

In short, the Bylaws cannot constitute the underlying contract for purposes of plaintiffs' separate breach of the implied covenant of good faith and fair dealing claim.

2.

Just as the Bylaws here offer no ground for a breach of an implied covenant of good faith and fair dealing claim, Valley's administrative healthcare decision to award exclusive privileges to the Columbia Group cannot on its own give rise to a claim for breach of the implied covenant of

---

[8] The jury's no-cause verdict on plaintiffs' so-called "breach of contract" claim is not before us and cannot be relitigated. Here, as is often the case, the Bylaws did not meet the basic elements of contract formation -- mutual assent, offer and acceptance, and consideration. In such instances, we note that an alleged breach of medical staff bylaws is not and should not be presented as a breach of contract claim. The jury should not be instructed on contract formation or the different types of contracts or asked to find that a contract had been formed between the parties. Nor should the jury be prompted to award damages on such a claim. On the verdict sheet in this appeal, there should have been only one question on the "breach of contract" claim which should have read: "Under the Bylaws, were plaintiffs entitled to a hearing?" If the jury had answered that hypothetical question "Yes," then the judge could have ordered equitable relief -- a hearing -- not money damages, as question three impermissibly allowed.

34

good faith and fair dealing, although equitable relief might be available under certain circumstances.

We have long held, and we reaffirm here, that hospitals maintain "broad discretionary powers" in making administrative decisions related to healthcare. See Desai, 103 N.J. at 90. Courts generally defer to a hospital's administrative healthcare decisions given "the intrinsic complexities that abound in the area of institutional public health care." Id. at 91-92. And when those decisions involve the enactment of "broad" hospital policies, like a closed or restrictive staff-admissions policy, "the freedom of decisional action accorded a hospital is even greater and judicial review [is] more tolerant," Berman, 103 N.J. at 107, even though such an admission policy will inevitably have a discriminatory impact upon some doctors, Desai, 103 N.J. at 91. This includes a hospital's decision to enter into an exclusive agreement that grants privileges to one group of physicians, typically at the expense of another. See, e.g., Cipolla, 96 N.J. at 211 (upholding an exclusive contract for anesthesia services because it "was motivated by the hospital's desire to [ensure] a high standard of medical care," where the benefits included 24-hour coverage, less administrative issues, and more efficient operating rooms).

But the discretion afforded to hospitals in making such decisions is not unlimited: "A hospital exercises its [healthcare] powers 'in trust,' 'for the

35

benefit of the public,' and 'in aid of [its] service to the public.'" Berman, 103 N.J. at 106 (second alteration in original) (quoting Greisman v. Newcomb Hosp., 40 N.J. 389, 403-04 (1963)). In the seminal case of Falcone v. Middlesex County Medical Society, this Court first recognized that associations engaged in "activities vitally affecting the health and welfare of the people" have fiduciary powers that are "to be exercised in [a] reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally." 34 N.J. 582, 596-97 (1961). Two years later, in Greisman, this Court extended that rationale to the context of a hospital's selection of its medical staff. 40 N.J. at 402-04. Since then, this Court has continuously emphasized the important societal role hospitals play when enacting healthcare policies. See, e.g., Doe v. Bridgeton Hosp. Ass'n, Inc., 71 N.J. 478, 487 (1976); Cipolla, 96 N.J. at 208; Desai, 103 N.J. at 86; Berman, 103 N.J. at 106; Nanavati v. Burdette Tomlin Mem'l Hosp., 107 N.J. 240, 248 (1987).

And, in recognition of the hospital's obligations to the public it serves, we have held that a hospital's administrative healthcare decision will be upheld only if that decision: (1) genuinely serves a public healthcare objective; (2) "is reached in the normal and regular course of conducting the affairs of the hospital[;] and [(3)] is based on adequate information, regardless

36

of form, origin, or authorship, that is generally considered reasonable and reliable by professional persons responsibly involved in the [healthcare] field." Desai, 103 N.J. at 91-93. This presupposes good faith. A hospital may not act in bad faith and simultaneously serve a "genuine" healthcare objective based on "reasonable and reliable" information. In furtherance of the public's well-settled interests in healthcare, we hold that a reasonable, rational, and valid healthcare decision must be made in good faith. In other words, a hospital healthcare policy made in bad faith under the guise of a genuine public healthcare objective cannot withstand judicial scrutiny.

Physicians who are adversely affected by a hospital's administrative healthcare decision, therefore, may challenge that decision by arguing that it was not made in accordance with the three-part standard set forth in Desai. In a case concerning a chiropractor who argued that he was impermissibly denied privileges due to a hospital's exclusionary staff policy, the Appellate Division explained:

> While plaintiff was not entitled to any procedural protections under the bylaws or the Fourteenth Amendment, he was entitled to have his claim reviewed under the special standard developed by our courts for review of administrative decisions treating exclusion of certain categories of practitioners, as distinguished from decisions on the qualifications of individual applicants. . . . [Greisman, 40 N.J. at 403-04, and Falcone, 34 N.J. at 597] permitted judicial review of exclusionary policies[] on the theory that hospitals

37

acted as fiduciaries for the public and could not exercise their discretion over staff composition without considering the interests of the medical profession and the public.

[Petrocco v. Dover Gen. Hosp. & Med. Ctr., 273 N.J. Super. 501, 513-14 (App. Div. 1994) (emphases added).]

Here, the trial judge concluded that plaintiffs' challenge to the Exclusive Agreement -- the Berman claim -- was "subsumed" with their implied covenant claim. As a result, plaintiffs no longer had a stand-alone Berman claim. Instead, the legal principles of Berman became relevant only as to Valley's defense to plaintiffs' implied covenant claim, which was premised on an alleged oral or implied contract providing them certain rights and privileges in perpetuity. At trial, Valley defended against that claim by introducing evidence to prove that it made a valid healthcare decision by entering into the Exclusive Agreement. Plaintiffs therefore sought money damages not for a Berman violation, but rather for an alleged breach of the implied covenant of good faith and fair dealing, which attached to an alleged oral or implied contract beyond the rights afforded under the Bylaws.

3.

The final basis advanced in the course of this litigation for finding that Valley was bound to act in good faith and deal fairly with plaintiffs is an alleged implied contract between the parties, one that goes "beyond the

38

Bylaws." Plaintiffs allege that, from Valley's initial offer to join and collaboratively build Valley's neuroscience department and from the parties' course of dealings since plaintiffs joined, it can be reasonably inferred that an implied contract existed between plaintiffs and Valley. That purported contract allegedly imposed obligations beyond the provisions of the Bylaws. In the event that plaintiffs could demonstrate that all the fundamental elements of contract formation had been established, their theory of an agreement beyond the rights afforded by the Bylaws would be contractual in nature. It could thus serve as the underlying contract to support a claim for breach of the implied covenant of good faith and fair dealing and could provide a proper basis for damages.

Essentially, plaintiffs argue that an "implied-in-fact" contract existed between them and Valley. "[C]ontracts implied in fact are no different than express contracts, although they exhibit a different way or form of expressing assent than through statements or writings. Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of the surrounding circumstances." Wanaque Borough Sewerage Auth. v. Township of West Milford, 144 N.J. 564, 574 (1996). And, despite the difference in the way the contracts are created, an implied-in-fact contract is generally "as binding as [an] express contract." Troy v. Rutgers, 168 N.J. 354,

39

365 (2001). "[T]here is no distinction in the effect of the promise whether it is expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others." Ibid. (alteration in original) (quoting Restatement (Second) of Contracts § 19 cmt. a (Am. Law Inst. 1981)).

Thus, an implied-in-fact contract may form based on the parties' actions, course of conduct, oral expressions, or a combination of the three. See ibid. And, significantly, an implied-in-fact contract gives rise to the implied covenant of good faith and fair dealing regarding the performance of that contract. Guz v. Bechtel Nat'l, Inc., 8 P.3d 1089, 1112 (Cal. 2000) (noting that the breach of an implied contract "may also constitute a breach of the implied covenant of good faith and fair dealing" but that, "insofar as the employer's acts are directly actionable as a [direct] breach of an implied-in-fact contract term, a claim that merely realleges that breach as a violation of the covenant is superfluous").

Among the three possible sources to support plaintiffs' claim here -- the Bylaws, Valley's "Berman" decision, and the alleged implied-in-fact contract between plaintiffs and Valley -- the only alleged source of mutual obligation to which the implied covenant of good faith and fair dealing could properly attach to is the implied-in-fact contract. Whether plaintiffs' implied covenant claim properly survived summary judgment and was appropriately considered

40

by the jury thus depends on plaintiffs' implied-in-fact contract theory. We first consider whether the claim properly survived summary judgment.

B.

When reviewing a denial of summary judgment, "we apply the same standard governing the trial court." Qian v. Toll Brothers, Inc., 223 N.J. 124, 134-35 (2015) (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012)). Thus, "view[ing] the evidence in the light most favorable to the non-moving party," ibid., summary judgment must be granted if based on "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," "there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law," Rule 4:46-2(c); Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 528-29 (1995).

Here, there are two questions pertinent to Valley's motion to dismiss the implied covenant claim on summary judgment. First, we must consider whether there is a factual dispute as to whether an underlying contract, beyond the rights afforded under the Bylaws, supports the implied covenant claim, and second, we must decide whether there is a factual dispute concerning Valley's alleged bad faith conduct.

41

As to the first question, the answer is yes. A hospital can give doctors specific privileges and rights beyond those afforded in the medical staff bylaws. Here, there is sufficient evidence in the summary judgment record, when viewed in the light most favorable to plaintiffs, to support the notion that the parties had a special relationship -- rooted in part in their course of dealings for more than a decade -- that gave plaintiffs specific rights and obligations beyond the Bylaws.

On this point, several provisions in the Bylaws seemingly leave room for the formation of such an extra agreement. For example, one provision references the possibility of a Medical Staff member having, in addition to rights under the Bylaws, "an actual contractual relationship with the Hospital." And a 2013 letter from Meyers to Dr. Roth similarly raises the possibility of a contract beyond any obligations created by the Bylaws. That letter stated: "Your appointment and clinical privileges also shall be subject to the terms and provisions of any contract, should you have one with the Hospital."

Moreover, whether parties' interactions rise to the level of creating an implied contract is generally a question of fact best resolved by the jury. See Troy, 168 N.J. at 366 ("Whether the parties acted in a manner sufficient to create implied contractual terms is a question of fact generally precluding summary judgment."); Labus v. Navistar Int'l Transp. Corp., 740 F. Supp.

42

1053, 1063 (D.N.J. 1990) (noting, with regard to a claimed oral employment contract, that "[t]he legitimacy of the representations and the reasonableness of the employee's reliance are questions for the finder of fact that are not appropriate for summary judgment").

Looking at the facts in the light most favorable to plaintiffs, as we must at the summary judgment stage, the record shows plaintiffs "relied upon Valley's offer," joined the Medical Staff, then "for the next dozen years, . . . invested resources in building up their practice, reputation, and patient base." Plaintiffs assert that they helped transform Valley into a "Neuroscience Center of Excellence." The parties' course of dealing supports an implied contract that, in exchange for stopping the outflow of patients to other hospitals and by devoting substantial time and resources to "modernizing Valley's neurosurgical department" through establishing cutting-edge "Biplane" and "Gamma Knife" technology and the Valley "Spine Center," Valley agreed that plaintiffs could continue to build their medical practice at Valley without any restrictions on treating "unassigned" ER patients.[9] Such an arrangement -- derived from an alleged implied-in-fact contract, oral contract, or otherwise --

_____

[9] At oral argument before this Court, plaintiffs' counsel acknowledged that their privileges were not granted in perpetuity and could have been revoked provided that Valley's decision to do so was a valid administrative healthcare decision.

43

went beyond the Bylaws because the Bylaws did not expressly give plaintiffs those rights in exchange for modernizing Valley's neurosurgical center. And because plaintiffs' "breach of contract" claim pertains only to whether they were entitled to a hearing under the Bylaws, plaintiffs' two "contract" claims are not duplicative as they are based on two allegedly distinct contracts.

As to the second question, whether plaintiffs raised a factual dispute concerning if Valley failed to deal with them fairly and in good faith, plaintiffs presented evidence that Valley created a "sham" White Paper to justify "oust[ing]" plaintiffs for being disloyal and entering an Exclusive Agreement as "a pretext for the exercise of a contractual right to terminate." See Seidenberg v. Summit Bank, 348 N.J. Super. 243, 260 (App. Div. 2002) (noting that breach of the implied covenant of good faith and fair dealing is usually tied to one of three situations: "(1) when the contract does not provide a term necessary to fulfill the parties' expectations; (2) when bad faith served as a pretext for the exercise of a contractual right to terminate; and (3) when the contract expressly provides a party with discretion regarding its performance" (emphasis added) (citations omitted)). Here, plaintiffs adduced sufficient evidence to raise a genuine question about whether Valley acted in bad faith by having a predetermined outcome for the White Paper; by manipulating the data and methodology utilized in creating that paper; and by

44

entering into the Exclusive Agreement based upon animus toward plaintiffs rather than valid healthcare concerns.

Therefore, applying our de novo standard of review, we hold that plaintiffs' implied covenant of good faith and fair dealing claim, supported by an alleged implied-in-fact contract, properly survived Valley's motion for summary judgment.

C.

Although we find that plaintiffs' claim of breach of the implied covenant of good faith and fair dealing properly reached the jury, there were significant problems in the jury instructions and verdict sheet that call into question the jury's verdict on that claim.

1.

We review whether the jury was adequately instructed on the law de novo, affording no deference to the trial judge's interpretive legal conclusions. Fowler v. Akzo Nobel Chems., Inc., 251 N.J. 300, 323 (2022). "[A]ppropriate and proper charges to a jury are essential for a fair trial." Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 256 (2015) (quoting Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). A judge must explain "the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." Viscik v. Fowler Equip.

45

Co., 173 N.J. 1, 18 (2002) (quoting Rendine v. Pantzer, 276 N.J. Super. 398, 431 (App. Div. 1994), aff'd, 141 N.J. 292 (1995)).

In addition to outlining the jury's role and framing the issues to be decided, the jury charge must "correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them." Prioleau, 223 N.J. at 256-57 (quoting Velazquez, 163 N.J. at 688). But when "[a] jury instruction . . . has no basis in the evidence[,] [it] is insupportable, as it tends to mislead the jury." Dynasty, Inc. v. Princeton Ins. Co., 165 N.J. 1, 13-14 (2000) (quoting Lesniak v. County of Bergen, 117 N.J. 12, 20 (1989)).

Not every improper charge warrants correction. "[A]n erroneous jury instruction [that] was 'incapable of producing an unjust result or prejudicing substantial rights'" does not require a new trial. Prioleau, 223 N.J. at 257 (quoting Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (App. Div. 2013)); see also R. 2:10-2. Rather, we will reverse and order a new trial only when "the jury could have come to a different result had it been correctly instructed." Viscik, 173 N.J. at 18. And in construing a jury charge, we examine it "as a whole, rather than focus on individual errors in isolation" by considering "the language surrounding an alleged error in order to determine its true effect." Ibid.

46

That includes consideration of how the relevant issues are presented on the verdict sheet. The "verdict sheet constitutes part of the trial court's direction to the jury." State v. Galicia, 210 N.J. 364, 388 (2012); see also Bolz v. Bolz, 400 N.J. Super. 154, 161-63 (App. Div. 2008) (assessing a verdict sheet as part of the jury instructions and concluding that the sheet's failure to require a discrete mandatory finding on an issue required reversal and a new trial). "[D]efects in the verdict sheet are reviewed on appeal under the same 'unjust result' standard of Rule 2:10-2 that governs errors in the jury charge." Galicia, 210 N.J. at 388.

2.

Here, we find several defects with the way the jury was charged. The verdict sheet compounded those problems, and contrary to plaintiffs' assertions at oral argument, the charge and verdict sheet cannot be "married together" to uphold the verdict.[10]

The first problem with the final jury charge deals with the law given on plaintiffs' "breach of contract" claim concerning the Bylaws. As plaintiffs' trial counsel himself described at the charge conference: "This is not your

---

[10] Whether a correct verdict sheet can "cure" deficient verbal jury instructions is a fact-sensitive question that must be considered on a case-by-case basis. And here, as we explain, the incorrect verdict sheet compounded the errors in the jury charge.

typical contract action." Counsel repeatedly stressed to the judge that "[t]here is no offer, acceptance, [and] consideration in the context of the [Bylaws]." Plaintiffs' trial counsel emphasized that charging the jury on basic contract formation principles, in his words, would "fundamentally mislead" the jurors.

Plaintiffs' trial counsel was right. Contract formation principles should not have been explained in the part of the final jury charge on plaintiffs' claim that Valley failed to give them a hearing, and the jury should not have been prompted through the verdict sheet to determine whether denial of a hearing was a "breach" that warranted money damages. Had the jury found breach and awarded damages based on the failure to hold a hearing under the Bylaws, the verdict on the mislabeled "breach of contract" claim could not stand; as we explained, all that could have been awarded based on a violation of the Bylaws was a hearing.

The second problem with the jury charge is that the discussion of contract formation was incorrectly included in the count predicated on the Bylaws and erroneously omitted in the count for which it was indispensable -- the breach of covenant claim. Although plaintiffs rightly note that duplicate instructions need not be given, finding the existence of a contract, which in this case had to be one beyond the Bylaws, was an essential element of plaintiffs' breach of the implied covenant claim. By failing to instruct the jury

48

on contract formation principles in connection to the only claim where that law was applicable, the judge only heightened the potential that the jurors would be led to believe that the Bylaws were a contract that could give rise to the covenant of good faith and fair dealing.

This was reinforced by the jury sheet's instruction that if damages are granted for breach of the Bylaws, then the jury need not consider the breach of covenant claim. Based on the way the two claims were presented to the jury, the jury could have reasonably believed that it was being asked to assess whether Valley violated the terms of the Bylaws or their spirit. As a result, we have no way of reasonably knowing on appeal what purported "contract" or "contracts" the jurors regarded as the foundation for their damages award. To prevent that confusion, the word "contract" should not have appeared under count one of the verdict sheet and should have been clarified as a "contract beyond the rights afforded under the Bylaws" under count two of the verdict sheet.

The third problem concerns the judge's attempt to frame the "parties' contentions" considering "the applicable legal principles." Prioleau, 223 N.J. at 256 (quoting Viscik, 173 N.J. at 18). Valley argued in its defense to plaintiffs' breach of covenant claim that it did not act unfairly or in bad faith but rather made a valid healthcare decision in granting exclusive privileges to

49

the Columbia Group. It is perhaps that defense, predicated on <u>Berman</u> and <u>Desai</u>, that led the trial judge to conclude that plaintiffs' challenge to the Exclusive Agreement (i.e., the "<u>Berman</u>" claim) was "subsumed" within their implied covenant claim.[11] But that decision disadvantaged both parties because the jury was never informed of the principles derived from <u>Berman</u> and <u>Desai</u>.

Plaintiffs conceded, even in the face of their implied covenant claim, that Valley had the <u>legal authority</u> to make a <u>valid</u> healthcare decision. To that point, plaintiffs' trial counsel requested that the charge include <u>Berman</u> guidance so that the jury could measure the reasonableness of Valley's defense

---

[11] Even though the judge ruled that the <u>Berman</u> claim was "subsumed" in the implied covenant claim, he expressed apprehension about the appropriate relief for a pure <u>Berman</u> violation. To be sure, equitable relief is appropriate for a stand-alone <u>Berman</u> violation. But plaintiffs' implied covenant claim is different than a stand-alone <u>Berman</u> claim. It is premised on plaintiffs' theory that Valley acted in bad faith -- even before the purportedly pretextual White Paper was released -- by deciding to enter into a "sham" Exclusive Agreement, which plaintiffs argued had frustrated their reasonable expectations associated with an underlying implied or oral contract, one beyond the rights afforded by the Bylaws, to treat "unassigned" ER patients. The legal theories and remedies for a <u>Berman</u> claim and plaintiffs' distinct implied covenant claim are different; one is not "subsumed" in the other. Nevertheless, plaintiffs have not challenged the trial judge's "subsumed" ruling, and instead sought money damages only on their implied covenant claim. After the "subsumed" ruling, their contention was not that the public was harmed by the Exclusive Agreement, but rather, that plaintiffs were harmed and entitled to money damages because Valley breached the implied covenant of good faith and fair dealing.

that it made a valid healthcare decision.  That request for a <u>Berman</u> jury charge was in essence denied by the trial judge.  Although the charge references "the requirement of an objective healthcare basis" in passing when discussing the parties' contentions, that was not enough.  For the jury to properly assess the validity of Valley's defense, i.e., that Valley acted "entirely lawful[ly] and appropriate[ly]," the judge needed to <u>fully</u> inform the jury of our <u>Berman</u>/<u>Desai</u> principles.

In other words, the charge should have included that a hospital's discretionary healthcare decision is "entirely lawful" when it:  (1) genuinely serves a public healthcare objective; (2) is made in the "regular course of conducting the affairs of the hospital"; and (3) is based on adequate, reliable, and reasonable information as would be relied upon "by professional persons responsibly involved in the [healthcare] field."  <u>Desai</u>, 103 N.J. at 91-93.  As plaintiffs concede, a valid healthcare decision would have nullified their allegation that Valley breached the implied covenant of good faith and fair dealing.  The jury was given no law on how to measure Valley's defense to the implied covenant claim.

Thus, consideration of the jury charge "as a whole," <u>Viscik</u>, 173 N.J. at 18, raises significant doubt as to whether the jury found the underlying contract for plaintiffs' implied covenant claim to be some implied or oral

51

agreement beyond the Bylaws, or just the Bylaws.  We reject the contention that the charge supports the verdict, and we conclude that the jury could have come to a different result had it been correctly instructed on the contract claims, especially because the underlying contract on the implied covenant claim -- purportedly an endless right to treat "unassigned" ER patients with special tools -- was not in writing.

V.

In this case, the uncertainty created by the jury charge was cumulatively exacerbated by two additional errors:  the admission into evidence of privileged communications between Goldfischer and Valley; and plaintiffs' attorney's improper summation comments.

A.

"[T]he applicability of the attorney-client privilege," including any potential waiver of that privilege, is a legal question which we review de novo. Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013).  Therefore, a trial judge's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

52

"[E]nshrined in history and practice," the attorney-client privilege applies to communications made "by an individual in his capacity as a client" for the purpose of "seeking or receiving legal advice from the attorney" with an expectation that it remain confidential. Stengart v. Loving Care Agency, Inc., 201 N.J. 300, 315 (2010). The privilege further applies to communications between a corporation's general counsel and its officers or other "authorized representative[s]." See Macey v. Rollins Env't Servs. (N.J.), Inc., 179 N.J. Super. 535, 539-41 (App. Div. 1981) (relying on Upjohn Co. v. United States, 449 U.S. 383 (1981), and holding that "[t]he necessity for full and open disclosure between corporate employees and in-house counsel . . . demands that all confidential communications be exempt from discovery"); N.J.R.E. 504(3). We have emphasized how "the primary justification and dominant rationale for the" attorney-client privilege is to encourage the "free and full disclosure of information" because "the public is well served by sound legal counsel based on full and candid communication between attorneys and their clients." Fellerman v. Bradley, 99 N.J. 493, 498, 502 (1985).

In this case, Valley sought to claw back a batch of emails totaling 352 pages it inadvertently produced during expedited discovery. After conducting an in-camera review, the chancery judge generally found that

> [t]o the degree that the contested communications were
> sent by or to [Goldfischer], the [emails] fall within the

53

definition of communications normally protected by the attorney-client privilege. The court is satisfied that the [emails] sent to or by [Goldfischer] were made for the purpose of legal advice rather than business purposes, as they relate to legal decisions and required the judgment that one normally exercises in a legal, rather than a business capacity.

We agree with the chancery judge. Goldfischer dispensed legal advice to Valley's officers and employees regarding the legal implications of entering an exclusive agreement that would adversely impact plaintiffs. That is what lawyers do and that is exactly what she did here. As Valley's top lawyer, she understood that such an agreement could lead to litigation. Consistent with the rationale for the attorney-client privilege, Goldfischer counseled Valley to document its reasons for its actions, analyze the data, and act carefully. Goldfischer's emails admitted into evidence at trial that were made for the purpose of legal advice, rather than business purposes, are protected by the attorney-client privilege.

Of course, the privilege is not absolute -- a client can waive the attorney-client privilege by placing legal advice provided by an attorney "in[-]issue." Kinsella v. Kinsella, 150 N.J. 276, 300 (1997). In other words, when a party places an attorney-client "communication which goes to the heart of the claim in controversy," as part of their claim or defense, the privilege is waived. Ibid. (quoting Developments in the Law: Privileged Communications, 98 Harv. L.

Rev. 1450, 1637-38 (1985)).  Such would be the case, for example, when a

client produces testimony from an attorney that the client acted on advice of

counsel.  In that situation, the client cannot then selectively invoke the

privilege by "divulg[ing] whatever information is favorable to its position[,]

and [then] assert the privilege to preclude disclosure of the detrimental facts."

United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 567 (App. Div. 1984).

But that is not what happened here.  Contrary to the chancery judge's

ruling, Valley did not place Goldfischer's pre-litigation legal advice "in-issue"

by relying on the White Paper.  Goldfischer had no direct communication with

plaintiffs or their attorney; she did not author the White Paper; she did not act

as an investigator for the White Paper; and she did not engage in non-legal

activities surrounding the White Paper.  And prior to the order allowing

plaintiffs to retain privileged emails, Valley never defended against plaintiffs'

claims by producing Goldfischer as a witness.

Our conclusions are further supported by the fact that, as the chancery

judge found, plaintiffs could have challenged the merits of the White Paper in

a "less intrusive manner."  And they did just that.  Plaintiffs' trial counsel

cross-examined the analysts and authors of the White Paper and argued to the

jury that Valley acted in bad faith by attempting to "oust" plaintiffs because

they were disloyal to Valley.  Plaintiffs could have done that without any

55

reference to Goldfischer's legal advice. Courts should be circumspect to find the existence of a waiver of the attorney-client privilege when relevant information can be secured elsewhere. Doing otherwise would discourage the "free and full disclosure of information from the client to the attorney." Fellerman, 99 N.J. at 498.

Further clouding the issue of whether Valley waived the attorney-client privilege is the fact that Valley inadvertently disclosed the Goldfischer emails during the whirlwind of what could realistically and fairly be described as an intense court-ordered expedited discovery. It is alleged that approximately 57,000 documents were exchanged in roughly two months, including a batch of emails allegedly consisting of 352 pages. During those same two months, from the initial return date of the OTSC in late January 2016 to late March 2016, Valley's counsel informed plaintiffs that some documents "got through" and subsequently sent plaintiffs a "claw back" letter pursuant to the parties' discovery agreement. That agreement anticipated precisely what occurred here: the inadvertent release of materials that could lawfully be withheld as privileged given the massive scope of documents involved and the short timeframe in which they were exchanged.[12]

---

[12] N.J.R.E. 530(c)(2) currently provides that "disclosure does not operate as a waiver in a state proceeding if: (A) the disclosure is inadvertent; (B) the

Valley's inadvertent disclosure of the Goldfischer emails, contrary to the chancery judge's finding, did not amount to waiver. Valley took "reasonable steps" to prevent disclosure, which in addition to executing the discovery agreement, included designating the emails with varying levels of confidentiality. Valley's then-counsel acted carefully considering the expedited exchange of voluminous written discovery -- where approximately 57,000 documents were exchanged in roughly two months.

Admission of the emails into evidence was not harmless. Select Goldfischer emails in many ways became the centerpiece of plaintiffs' case. In his opening statement to the jury, plaintiffs' counsel accused Goldfischer of involvement in a "conspiracy to concoct a reason to try to get rid of [plaintiffs]." Plaintiffs' counsel went on to highlight the privileged emails at length in his summation. And perhaps most prejudicial of all, plaintiffs were

_____

holder of the privilege or protection took reasonable steps to prevent disclosure; and (C) the holder promptly took reasonable steps to rectify the error." (effective July 1, 2020). At the time of the chancery judge's decision in this case, N.J.R.E. 530 (July 1, 1993) (codifying N.J.S.A. 2A:84A-29) governed disclosure of privileged materials. That provision provided that "[a] person waives the privilege if she, 'without coercion and with knowledge of [her] right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.'" Stengart, 201 N.J. at 323 (second alteration in original) (quoting N.J.R.E. 530 (July 1, 1993)). Although we do not find a waiver under either N.J.R.E. 530 standard, we note that the parties' focus on inadvertence corresponds more closely to the current statutory test.

57

permitted to call Goldfischer as a trial witness where she had to answer questions about her emails admitted at the trial pertaining to her confidential legal advice.

Lastly, we note that plaintiffs introduced a handful of the Goldfischer emails at trial. To be sure, her emails containing legal advice should have been excluded from admission into evidence. However, the record is unclear whether the chancery judge conducted a document-by-document review of all the emails identified in Valley's claw back letter because of his blanket ruling that Valley generally waived the attorney-client privilege. On remand, if plaintiffs attempt to introduce into evidence Goldfischer emails containing legal advice in the 352-page batch that Valley attempted to claw back, we instruct the remand judge to conduct a document-by-document review to determine whether those emails are protected by the attorney-client privilege. If the remand judge concludes they are protected by the attorney-client privilege, then those emails will be inadmissible at the remand trial.

B.

We also find that certain comments by plaintiffs' trial counsel in summation were improper. It is well established that "counsel is allowed broad latitude in summation." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)).

58

But that latitude is not unlimited:  "counsel's comments must be confined to the facts shown or reasonably suggested by the evidence introduced during the course of the trial."  Ibid.  Counsel cannot "misstate the evidence [or] distort the factual picture" -- summation comments "must be based in truth."  Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting Colucci, 326 N.J. Super. at 177).  That includes commenting on the lack of evidence after successfully excluding such evidence, despite knowing it exists.  See, e.g., id. at 433 (holding that counsel improperly asked the jury "[w]here are the outside independent experts in cardiology?" after successfully moving to exclude two experts).

Since no objections were made to the summation comments, we review for plain error and reverse only if there was an error that "was 'clearly capable of producing an unjust result,' R[ule] 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'"  State v. Dunbrack, 245 N.J. 531, 544 (2021) (omission in original) (emphasis added) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)).

Here, after opening the door by questioning a Valley analyst about patient transfers, plaintiffs' counsel successfully prevented Valley from cross-examining that witness on the patient transfers.  The trial judge erred by

59

preventing Valley from introducing this evidence because it tends "to prove or disprove any fact of consequence to the determination of the action," N.J.R.E. 401 -- namely, to justify the Exclusive Agreement. A challenge to the evidence, specifically the timing of Valley's discovery of the patient transfers, would go to its weight, not admissibility.

After this favorable ruling, plaintiffs' trial counsel surmised to the jury:

> [T]here are two instances that they have mentioned that there was a transferred patient . . .
>
> [D]o you think that if there were more, they would have presented them to us? Do you think if they existed, they would have found their way into the [White Paper]? Because there are none. It isn't even mentioned in the [White Paper].
>
> [(emphases added).]

Plaintiffs' trial counsel knew that Valley had evidence of sixty cases of patient transfers. The summation remarks implied, however, that there was evidence of only two cases of patient transfers, and that inaccurate statement impacted Valley's contention that it made a valid healthcare decision. The comments impermissibly "exploited a favorable evidentiary ruling . . . to strike an unfair blow at the defense." State v. Garcia, 245 N.J. 412, 434 (2021). Although on their own the remarks might not be "clearly capable of producing an unjust result," Rule 2:10-2, we consider the remarks in context with the other

60

substantial trial errors and hold that an unjust result was clearly capable of being reached.

## VI.

We may reverse a trial court's judgment and order a new trial when "the cumulative effect of small errors [is] so great as to work prejudice." Torres v. Pabon, 225 N.J. 167, 190 (2016) (alteration in original) (quoting Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 53 (2009)). In a cumulative error analysis, we do not merely count the number of mistakes "because even a large number of errors, if inconsequential, may not operate to create an injustice." Id. at 191 (quoting Pellicer, 200 N.J. at 55). Rather, "we consider the aggregate effect of the trial court's errors on the fairness of the trial." Ibid. The cumulative errors here -- by no means inconsequential -- deprived Valley of a fair trial and warrant a new one.

## VII.

We offer these final thoughts about the remand proceedings. Valley obtained a no-cause verdict on plaintiffs' "breach of contract" claim. In other words, the jury rejected plaintiffs' claim that they were entitled to a hearing under the Bylaws. That issue therefore cannot be retried even though, as noted above, the question of whether Valley violated the Bylaws in altering

61

plaintiffs' privileges without a hearing was improperly presented to the jury through the instructions and verdict sheet.

On the other hand, the jury must decide, on retrial, whether Valley breached an implied covenant of good faith and fair dealing premised on an underlying contract beyond the rights and obligations afforded by the Bylaws. And instructions on <u>Berman</u> and <u>Desai</u> must be given to the jury so that Valley's defense can be fairly considered. If plaintiffs sustain their burden on their implied covenant of good faith and fair dealing claim -- without reference to privileged emails containing legal advice or suggestions about the absence of evidence regarding patient transfers -- money damages are appropriate.

## VIII.

We reverse the appellate court's judgment, vacate that part of the verdict on the implied covenant claim, and remand for further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and NORIEGA join in JUSTICE FASCIALE's opinion.

62